UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MONUMENTAL TASK                           CIVIL ACTION
COMMITTEE, INC ET AL.

VERSUS                                    NO: 15-6905

ANTHONY R. FOXX ET AL.                    SECTION: "J"(3)

### ORDER & REASONS

Before the Court is a *Motion for Temporary Restraining Order and Preliminary and Permanent Injunctive Relief* **(Rec. Doc. 11)** filed by Plaintiffs, Monumental Task Committee, Inc. ("MTC"), Louisiana Landmarks Society ("LLS"), Foundation for Historical Louisiana, Inc. ("FHL"), and Beauregard Camp No. 130, Inc. ("BC130"); an opposition (Rec. Doc. 27) filed by Defendants Anthony R. Foxx, Matthew Welbes, Federal Transit Administration, and the United States Department of Transportation (collectively "Federal Defendants"); an opposition (Rec. Doc. 35) filed by Defendants Mitchell J. Landrieu and the City of New Orleans (collectively "the City"); an opposition (Rec. Doc. 38) filed by Defendant New Orleans Regional Transit Authority; and a reply (Rec. Doc. 36) filed by Plaintiffs. Having considered the motion, legal memoranda, and arguments of counsel; the record; and the applicable law, the Court finds that the motion should be **DENIED**.

## FACTS AND PROCEDURAL BACKGROUND

The events that precipitated this litigation are widely known, so the Court will provide only a brief summary here. This dispute arises from the City's decision to remove three monuments honoring Confederate leaders and a fourth commemorating an 1874 battle between the White League and the City's first integrated police force. The four monuments are the Robert E. Lee Monument, the P.G.T. Beauregard Equestrian Monument, the Jefferson Davis Monument, and the Battle of Liberty Place Monument.

On June 26, 2015, Mayor Landrieu asked the City Council to initiate the legal process for removing the four monuments pursuant to section 146-611 of the City's Code of Ordinances. (Rec. Doc. 35-1, at 1.) On July 9, 2015, the City Council adopted a resolution soliciting recommendations from various City agencies regarding whether the monuments should be deemed a nuisance and removed from public property. *Id.* at 3-4. On August 13, 2015, the Historic District Landmarks Commission ("HDLC") held the first meeting to provide comments and recommendations regarding the removal of the monuments. *Id.* at 5. Following public comment, the HDLC voted 11-1 to recommend removal of each monument. *Id.* That same day, the Human Relations Commission ("HRC") held a public hearing on monument removal. *Id.* at 12. The HRC also voted to recommend removal of the monuments. Further, on September 2, 2015, the Vieux

Carré Commission ("VCC") considered the Battle of Liberty Place Monument and voted unanimously to recommend removal. *Id.* at 15.

In addition, the City Council also received reports and recommendations from public officials. For example, the City Attorney conducted her own analysis and opined that the monuments were inconsistent with the requirements of equal protection and constituted a nuisance. *Id.* at 28. Police Superintendent Michael Harrison confirmed that the sites had been the location of criminal activity and violent protest. *Id.* at 25. The Director of Property Management advised the City Council that the City had spent several thousand dollars removing graffiti from the monuments in 2015. *Id.* at 23. Further, the City's Chief Administrative Officer advised the Council that a potential donor had agreed to fund the cost of removing the monuments. *Id.* at 35.

On December 1, 2015, the City Council introduced an ordinance providing for the removal of the monuments. *Id.* at 77. The City Council considered the ordinance at two separate meetings. The first, held on December 10, consisted of more than three hours of public comment; the second, held on December 17, included an additional three hours of public comment. On December 17, 2015, the City Council voted 6-1 to remove the monuments, and the ordinance was signed into law. *Id.* at 79.

Shortly after the City Council voted to remove the monuments, Plaintiffs filed this lawsuit. (Rec. Doc. 1.) Plaintiffs assert

3

approximately twelve causes of action falling into three broad categories: (1) claims alleging violations of federal statutes designed to protect historic sites; (2) claims asserted under 42 U.S.C. § 1983 and the First, Fifth, and Fourteenth Amendments of the United States Constitution; and (3) claims alleging violations of the Louisiana Constitution and state law. *Id.* at 17-47.

On the same day, Plaintiffs filed the instant *Motion for Temporary Restraining Order and Preliminary and Permanent Injunctive Relief* **(Rec. Doc. 11)**, requesting that the Court enjoin and prevent the City from moving, removing, disassembling, altering, placing into storage, or in any way tampering with the four monuments at issue. The Court held a telephone conference with the parties shortly thereafter, and the City agreed that it would take no action with respect to the removal of the monuments before the Court issues a ruling. (Rec. Doc. 12.) As a result, the Court set a hearing on Plaintiffs' motion for a preliminary injunction. (Rec. Doc. 16.) The Federal Defendants, the City, and the RTA each filed their oppositions on January 8, 2016. On January 11, 2016, Plaintiffs filed their reply. The Court held a preliminary injunction hearing on January 14, 2016, after which the Court took the matter under submission.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy" that may only be awarded upon a clear showing that the

4

plaintiff is entitled to such relief. *Munaf v. Geren*, 553 U.S. 674, 689 (2008). A plaintiff seeking a preliminary injunction must establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that their substantial injury outweighs the threatened harm to the party whom they seek to enjoin; and (4) that granting the preliminary injunction will not disserve the public interest. *Planned Parenthood Ass'n of Hidalgo Cty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012); *accord Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

None of the four requirements has a fixed quantitative value. *Texas v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975). Therefore, in applying the four-part test, "a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* This requires "a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury that possibly could flow from the denial of preliminary relief." *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 958 (3d Cir. 1984).

The decision to grant or deny a preliminary injunction is discretionary with the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). However, because a preliminary injunction is an extraordinary remedy, it "should not be granted unless the party seeking it has

clearly carried the burden of persuasion on all four requirements." *Suehs*, 692 F.3d at 348. Consequently, the decision to grant a preliminary injunction "is the exception rather than the rule." *Miss. Power & Light Co.*, 760 F.2d at 621.

The purpose of a preliminary injunction is limited to preserving the relative positions of the parties until a trial on the merits can be held. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* For this reason, the findings of fact and conclusions of law made by a court deciding whether to grant a preliminary injunction are not binding at trial on the merits. *Id.*

## PARTIES' ARGUMENTS AND DISCUSSION

### 1.   Threat of Irreparable Harm

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (3d ed. 2013) [hereinafter Wright & Miller]. The focus of this inquiry is not so much the magnitude but the

irreparability of the threatened harm. *See Callaway*, 489 F.2d at 575. The Fifth Circuit has defined irreparable harm to mean "harm for which there is no adequate remedy at law," such as monetary damages. *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013); *accord Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).

Plaintiffs must show that "irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury." *Id.* (alteration in original) (quoting Wright & Miller, *supra*, § 2948.1); *Morrell v. City of Shreveport*, 536 F. App'x 433, 435 (5th Cir. 2013). There must be more than "an unfounded fear on the part of the applicant." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). Accordingly, the party seeking a preliminary injunction must show that the threatened harm is "more than mere speculation." *Janvey*, 647 F.3d at 601; *see also Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931) ("[An injunction] will not be granted against something merely feared as liable to occur at some indefinite time in the future."); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("[T]he injury must be both certain and great; it must be actual and not theoretical."). Therefore, "[a] presently existing actual threat must be shown." *Morrell*, 536 F. App'x at 435 (alteration in

original) (quoting *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001)).

In sum, even if a plaintiff demonstrates a strong likelihood of success on the merits, a preliminary injunction may not be granted unless the plaintiff has shown a likelihood—not just a possibility—of irreparable harm. *See Winter*, 555 U.S. at 22-23. In *Winter*, the district court and Ninth Circuit had held that when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based merely on a "possibility" of irreparable harm. *Id.* at 21. The Supreme Court rejected the Ninth Circuit's "possibility" standard as too lenient. *Id.* at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."). Accordingly, a court must deny a motion for a preliminary injunction unless the plaintiffs demonstrate, at a minimum, that irreparable harm is *likely* in the absence of an injunction.

In attempting to show a likelihood of irreparable harm, Plaintiffs rely on two experts: Lawrence Robichaux and Thomas Bruno. Plaintiffs offer Robichaux as an expert in rigging and crane operations. (Rec. Doc. 19-2, at 1.) In Robichaux's opinion, there are many factors that would make removing, transporting, and

storing the four monuments extremely difficult. *Id.* at 2. For example, Robichaux opines that it will be difficult to determine the midpoint of each monument because the monuments are not symmetrical. *Id.* For this reason, Robichaux opines that movement and transportation of these monuments "requires a high degree of experience and expertise in both rigging and crane operations." *Id.* at 3. According to Robichaux, only the most specialized and experienced riggers and crane operators have the ability to properly lift and transport the monuments. *Id.* Ultimately, Robichaux opines that "unless the riggers and crane operators engaged to move and transport these four monuments are trained and experienced in complex and complicated lifts, there is a significant chance one or more of the monuments will be damaged." *Id.*

Plaintiffs also rely on the report of Thomas Bruno, sculptor and owner of the Thomas Bruno Gallery and Studio. (Rec. Doc. 43-13, at 1.) Bruno offers opinions regarding the potential harm to the Lee Monument and Beauregard Monument if the City attempts to move them. *Id.* Bruno opines that moving antique bronze statues involves a risk because the pieces are fragile and difficult to repair. *Id.* For example, Bruno explains that any effort to heat or weld the metal would damage the surface because the bronze would become molten and deformed. *Id.* at 2-3. In addition, Bruno advises that repairing the monuments without welding would be difficult

because the bronze plates are likely attached to an iron infrastructure, which has rusted and weakened over time. *Id.* at 3. In conclusion, Bruno opines that any damage to the Lee Monument or Beauregard Monument would be irreparable. *Id.*

In response, the City relies on the report of Warren Schambeau, Jr. The City offers Schambeau as an expert in demolition and construction management. (Rec. Doc. 35-1, at 114.) Schambeau was retained by H&O Investments, LLC, the City's former contractor, to consult regarding the relocation of the four monuments at issue. *Id.* Schambeau agrees with Robichaux's assertion that untrained and unskilled crane operators and riggers could damage one or more of the monuments. *Id.* at 115. However, Schambeau insists that his team will have qualified and highly-skilled crane operators and riggers for this project, as well as high-quality equipment. *Id.* at 116. Further, Schambeau claims that All Crane Rental of Louisiana, one of the leading crane and rigging companies in the United States, has been retained to engage in the removal of the monuments. *Id.* at 115. According to Schambeau, All Crane "is a high-performing company with extensive experience performing high-value lifts for clients in construction and heavy construction." *Id.* In Schambeau's opinion, "All Crane is in the top handful of companies that could be engaged for this sort of work." *Id.* Ultimately, Schambeau disagrees with Plaintiffs' assertion that damage to the monuments is likely if they are relocated.

10

In the instant case, Plaintiffs have failed to establish that irreparable injury is likely in the absence of an injunction. The gravamen of Robichaux's report is that the monuments may be damaged during relocation if the riggers and crane operators engaged to move and transport them are not highly skilled. Plaintiffs concede that Robichaux has not offered an opinion as to the likelihood of damage to the monuments if the company engaged to remove them is highly skilled and qualified. In short, Plaintiffs establish only the possibility of damage if the monuments are handled and stored irresponsibly. As evidenced by the photograph of the Lee Monument being removed from the top of its limestone column by a crane for renovations, these monuments can be relocated without being damaged. (Rec. Doc. 42-1.) Therefore, Plaintiffs have not shown that the threatened harm is more than mere speculation.

As discussed above, injunctions will not be granted merely to allay fears and apprehensions, or to soothe anxieties. *See Humble Oil & Ref. Co. v. Harang*, 262 F. Supp. 39, 44 (E.D. La. 1966) (denying preliminary injunction to restrain defendant from destroying documents or records before trial where plaintiff failed to prove a real danger of destruction). Even if irreparable injury is certain to occur if the monuments are relocated by unqualified riggers and crane operators, there is no evidence that the City will retain an unqualified company to relocate the monuments. To the contrary, Schambeau indicates that the City

11

intends to retain one of the leading crane and rigging companies in the United States.

In conclusion, Plaintiffs have failed to carry their burden of demonstrating that they will suffer irreparable harm if the preliminary injunction is not granted. Even if Plaintiffs are able to show a substantial likelihood of success on the merits, the Court cannot issue a preliminary injunction based only on a possibility of irreparable harm. Accordingly, Plaintiffs' motion for a preliminary injunction must be denied.

## 2.    Likelihood of Success on the Merits

Plaintiffs must also demonstrate a substantial likelihood that they will prevail on the merits of their claims. Courts use "a bewildering variety of formulations of the need for showing some likelihood of success." Wright & Miller, *supra*, § 2948.3. Some courts require the movant to show that the likelihood of success on the merits is greater than fifty percent. *See, e.g.*, *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985). However, the Fifth Circuit recognizes that a finding of substantial likelihood does not require a finding of a fixed quantitative value. *Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). Rather, "a sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits." *Id.*

12

When the other factors weigh strongly in favor of an injunction, "a showing of some likelihood of success on the merits will justify temporary injunctive relief." *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980). However, no matter how severe and irreparable the threatened harm and irrespective of the hardships which a preliminary injunction or lack of one might cause the parties, "the injunction should never issue if there is no chance that the movant will eventually prevail on the merits." *Seatrain Int'l*, 518 F.2d at 180.

To show a likelihood of success, plaintiffs must at least present a prima facie case, but need not prove that they are entitled to summary judgment. *Daniels Health Scis.*, 710 F.3d at 582. To assess the likelihood of success on the merits, the court looks to standards provided by the substantive law. *Sepulvado v. Jindal*, 729 F.3d 413, 418 (5th Cir. 2013).

### A. Federal Statutory Claims

In the first category of claims, Plaintiffs assert causes of action for violations of the Department of Transportation Act, 49 U.S.C. § 101 *et seq.*; National Historic Preservation Act, 54 U.S.C. § 300101 *et seq.*; and the Veterans Memorial Preservation and Recognition Act, 18 U.S.C. § 1369.

Plaintiffs invoke the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, as a basis of judicial review of the Federal

Defendants' actions. Pursuant to the APA, a person adversely affected or aggrieved by agency action is entitled to judicial review thereof. 5 U.S.C. § 702. Further, on such conditions as may be required and to the extent necessary to prevent irreparable injury, the APA permits the reviewing court to issue "all necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings." *Id.* § 705. Courts have recognized that this standard is the same as the standard for issuance of a preliminary injunction. *See, e.g.*, *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 446 (7th Cir. 1990).

Under § 706 of the APA, the reviewing court must uphold the agency's action unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The reviewing court must also hold unlawful and set aside agency action that is contrary to constitutional right, in excess of statutory authority, or without observance of procedure required by law. *Id.* § 706(2)(B)-(D). The ultimate standard of review is a narrow one. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). "The court is not empowered to substitute its judgment for that of the agency." *Id.* In applying this standard, "the focal point for judicial review should be the administrative record already in existence, not some

new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

### (1) Department of Transportation Act

Plaintiffs allege that the Federal Defendants facilitated or significantly contributed to the planning, funding, construction, and maintenance of six specific transportation projects involving the streetcar system in New Orleans:

(a)  the Loyola Avenue/Union Passenger Terminal Streetcar Expansion project;
(b)  a new streetcar line along North Rampart Street, from Canal Street to Elysian Fields Avenue;
(c)  construction of the Cemeteries Transit Center;
(d)  proposed construction of a streetcar line along St. Claude Avenue to Poland Avenue;
(e)  proposed construction of a downtown transportation hub in the Central Business District; and
(f)  refurbishment and rehabilitation of the historic St. Charles Avenue streetcar line.

(Rec. Doc. 1, at 16.)

Plaintiffs claim that the Federal Defendants violated the Department of Transportation Act ("DOT Act") by failing to conduct a section 4(f) analysis of the effect of the totality of the streetcar network in New Orleans on the monuments. Plaintiffs argue that the Secretary of Transportation's section 4(f) reviews failed to assume that the planning, funding, construction, and maintenance of the entire streetcar network in New Orleans was the scope of the "project" under review, and therefore failed to consider the extent to which the entire streetcar network resulted in "use" of section 4(f) resources, including the Lee Monument,

15

Beauregard Monument, and Davis Monument. Next, Plaintiffs argue that the Federal Defendants prepared an inadequate section 4(f) review of the project because they impermissibly divided the project into segments. Plaintiffs argue that by segmenting the project, the Secretary failed to acknowledge that the whole project, particularly maintenance of the St. Charles Avenue streetcar line, the Loyola Avenue/Union Passenger Terminal ("Loyola/UPT") streetcar expansion, and the new streetcar line along North Rampart Street, constitutes use of the monuments.

As a result, Plaintiffs claim that the Secretary approved the project without determining whether there is any feasible alternative to removing the monuments and without attempting to minimize the harm caused by the streetcar network's use of the monuments. In sum, Plaintiffs argue that the Secretary's refusal to prevent removal of the Lee Monument, Beauregard Monument, and Davis Monument, which they claim have been adversely affected by the planning, funding, construction, and maintenance of the entire streetcar system in New Orleans, is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

The DOT Act aims to prevent federally-funded transportation projects from unnecessarily harming historic sites. Section 4(f) of the DOT Act, now codified at 49 U.S.C. § 303(c), provides that the Secretary of Transportation may approve a transportation project that uses land from a historic site only if the Secretary

16

determines, first, that there is "no prudent and feasible alternative" to using that land and, second, that the project includes "all possible planning to minimize harm" to the historic site resulting from the use. 49 U.S.C. § 303(c). Section 4(f) does not apply to locally-funded projects.

Section 4(f) applies only if a federally-funded transportation project "uses" a historic site. *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 463 F.3d 50, 55 (1st Cir. 2006). A "use" of section 4(f) property occurs (1) when "land is permanently incorporated into a transportation facility"; (2) when "there is a temporary occupancy of land that is adverse in terms of the statute's preservation purpose"; or (3) when "there is a constructive use" of the property. 23 C.F.R. § 774.17. A "constructive use" occurs when "the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired." *Id.* § 774.15(a). "Substantial impairment occurs only when the protected activities, features, or attributes of the property are substantially diminished." *Id.* Ultimately, after conducting the appropriate review, the Secretary may make a finding of "de minimis impact" on the historic site if the Secretary determines that the transportation project will have no adverse effect on the historic site or there will be no historic

properties affected by the transportation project. 49 U.S.C. § 303(d)(2).

In the instant case, the Federal Defendants provided evidence that neither the Department of Transportation ("DOT") nor the Federal Transit Administration ("FTA") has approved or provided federal funding for three of the six transportation projects listed by Plaintiffs: (1) the proposed streetcar line along North Rampart Street; (2) the proposed streetcar line along St. Claude Avenue; and (3) the proposed construction of a downtown transportation hub in the Central Business District. (Rec. Doc. 21-1, at 3-4.) However, the Federal Defendants admit that they did provide federal funding for the remaining three streetcar projects: (1) the Loyola /UPT project;[1] (2) the Cemeteries Transit Center; and (3) the refurbishment of the St. Charles Avenue streetcar line. *Id.* at 2-4.

The Federal Defendants claim that the required section 4(f) reviews occurred for the three federally-funded projects. As a

---

[1] The Federal Defendants argue that any challenges to the Loyola/UPT project findings are barred by the applicable statute of limitations. Under 23 U.S.C. § 139(*l*), "a claim arising under Federal law seeking judicial review of a permit, license, or approval issued by a Federal agency for a highway or public transportation capital project shall be barred unless it is filed within 150 days after publication of a notice in the Federal Register announcing that the permit, license, or approval is final pursuant to the law under which the agency action is taken." The FTA published a notice of the approval of the Loyola/UPT project in the Federal Register on January 18, 2011. (Rec. Doc. 21-1, at 2.) Plaintiffs have not responded to the Federal Defendants' argument that their challenges to the Loyola/UPT project findings are untimely. Plaintiffs filed this lawsuit nearly five years after the FTA published notice of the approval of the Loyola/UPT project. Therefore, any challenges to those findings are barred by the statute of limitations.

result of the reviews, the FTA found that each project would have a de minimis impact on historic property. In addition, the Federal Defendants argue that the funding of these projects bears no factual, legal, or causal nexus to the removal or persistence of the four monuments at issue.

Plaintiffs claim that the Secretary impermissibly divided the project into multiple "segments" and failed to recognize that the streetcar network as a whole is the project in which the Federal Defendants are engaged. "Segmentation" or "piecemealing" is an attempt by an agency to divide artificially a project into smaller components to escape the application of the DOT Act or similar statutes. *See Save Barton Creek Ass'n v. FHWA*, 950 F.2d 1129, 1140 (5th Cir. 1992); *Riverfront Garden Dist. Ass'n, Inc. v. City of New Orleans*, No. 00-544, 2000 WL 35801851, at *9 (E.D. La. Dec. 11, 2000). Segmentation analysis functions "to weed out projects which are pretextually segmented and for which there is no independent reason to exist." *Riverfront Garden Dist.*, 2000 WL 35801851, at *9 (quoting *Barton Creek*, 950 F.2d at 1139).

The propriety of segmentation is determined by evaluating whether the proposed segment "(1) has logical termini, (2) has substantial independent utility, (3) does not foreclose the opportunity to consider alternatives, and (4) does not irretrievably commit federal funds for closely related projects." *Barton Creek*, 950 F.2d at 1140 (citing *Piedmont Heights Civic Club,*

*Inc. v. Moreland*, 637 F.2d 430, 439 (5th Cir. 1981)). "When, as here, the [transportation project] in issue lies within a metropolitan area, rather than between two cities, the pivotal factor is whether the projects have independent utility." *Riverfront Garden Dist.*, 2000 WL 35801851, at *9 (citing *Barton Creek*, 950 F.2d at 1140).

To evaluate independent utility, courts inquire into "whether each project would have taken place in the other's absence." *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 395 (4th Cir. 2014). If so, the projects have independent utility and are not considered connected actions. *Id.* When determining whether a project has independent utility, courts consider "the benefits and uses that will occur as a result of that action, even if no other construction is done in the area." *Id.* For example, the segments at issue in *Peidmont Heights*, *Barton Creek*, and *Riverfront Garden District* had independent utility. In *Barton Creek*, plaintiffs challenged two segments of what was to be an eighty-two-mile outer loop around Austin, Texas. The Fifth Circuit found that the challenged segments served a highly useful urban traffic purpose even if the other segments of the loop were never constructed. Similarly, in *Piedmont Heights*, the Fifth Circuit found that each highway segment at issue could individually contribute to relieving traffic congestion at specific points, and therefore serve its transportation purpose regardless of whether the other

projects were built. Lastly, in *Riverfront Garden District*, the court found that the segments at issue, although undeniably a part of an overall transportation plan, would independently contribute to alleviating traffic problems in the city.

In the instant case, each streetcar project identified by the Plaintiffs has independent utility. Similar to the projects in *Peidmont Heights*, *Barton Creek*, and *Riverfront Garden District*, each of the projects here serves an independent transportation purpose. For example, the Cemeteries Transit Center will improve safety for transit riders transferring between the bus lines and the streetcar line. (Rec. Doc. 21-7, at 8.) The Cemeteries Transit Center project would have taken place even in the absence of the other five projects. Furthermore, each project connects passengers to various points of interest or to other methods of transportation in the City.

Even assuming Plaintiffs are able to establish that the six streetcar projects were improperly segmented, Plaintiffs fail to explain how any of the six streetcar projects may harm the monuments. Indeed, "Plaintiffs acknowledge the Secretary of Transportation has not sought to displace any of the monuments with streetcar tracks." (Rec. Doc. 11-2, at 31.) Plaintiffs' argument would require the Federal Defendants to speculate as to how unrelated, future action from the City might affect historic sites near the streetcar network. Therefore, Plaintiffs fail to

identify a legal nexus between any of the six streetcar projects and the removal of the monuments.

Plaintiffs appear to argue that the removal of the monuments is itself a transportation project subject to the section 4(f) requirements. "Plaintiffs readily concede the obvious, i.e. the four monuments in question are not formally a part of the streetcar network." *Id.* at 41. However, Plaintiffs argue that "over time and through a century of custom, practice, and tradition, the monuments at issue have become so closely identified with the streetcar network in New Orleans they have become part of that network." *Id.* at 37. In support of this contention, Plaintiffs offer the report of James Guilbeau, a local author. Plaintiffs offer Guilbeau as an expert in the history of the streetcar network in New Orleans. Guilbeau opines that the association between the Lee Monument and the St. Charles Avenue streetcar line is so close and longstanding that the Lee Monument has effectively become a part of that streetcar line. (Rec. Doc. 43-14, at 1.) Similarly, Guilbeau opines that the location of the Beauregard Monument at the intersection of the Esplanade and City Park streetcar routes "was a major transfer point." *Id.* Guilbeau offers no opinion as to the other two monuments. Considering these opinions, Plaintiffs claim "it is fair to ask whether, in the hearts and minds of the citizens of New Orleans, these monuments have become as integral to the streetcar line as the tracks themselves." (Rec. Doc. 11-2, at 41.)

Plaintiffs cite no legal authority to support their "hearts-and-minds" theory, and the Court will not root about in the case law seeking support for it. *See Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) ("[A] district court . . . is not required to scour the party's various submissions to piece together appropriate arguments."). As the Seventh Circuit so eloquently put it: "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). In passing, Plaintiffs state that the civil law doctrine of *custom contra legem* "requires judicial acknowledgement that New Orleanians have established the monuments as part of the streetcar network." *Id.* at 42. Again, Plaintiffs provide no support for this argument.[2]

However, even assuming that Plaintiffs are able to establish that the monuments have become part of the streetcar network and their removal could be considered a transportation project, Plaintiffs fail to demonstrate that the DOT Act would apply to such a project. Plaintiffs do not argue that the Federal Defendants provided funding for the removal of the monuments. On the contrary, Plaintiffs acknowledge that the removal will be locally funded by

---

[2] The Louisiana Civil Code recognizes custom as a source of law. La. Civ. Code art. 1. "Custom results from practice repeated for a long time and generally accepted as having acquired the force of law." *Id.* art. 3. However, as a result of the 1987 revision, article 3 now expressly provides "[c]ustom may not abrogate legislation." *Id.* Therefore, it appears the doctrine *custom contra legem* is now prohibited by the Civil Code.

23

a donor. As a locally-funded project, the removal of the monuments would not be subject to the DOT Act unless it was improperly segmented from a federally-funded project. *See Barton Creek*, 950 F.2d at 1140. Here, the removal of the monuments is wholly unrelated to any transportation project, local or federal. It is undisputed that the presence or absence of the monuments does not affect the functionality or operation of the streetcar lines as a means of public transportation. Therefore, Plaintiffs fail to demonstrate a likelihood of success on the merits of their DOT Act claim.

### (2)  *National Historic Preservation Act*

Plaintiffs claim that the Federal Defendants violated the National Historic Preservation Act ("NHPA") by failing to conduct a section 106 review to determine whether the planning, funding, construction, and maintenance of all phases of the streetcar network in New Orleans has the potential to cause adverse effects on historic properties adjacent to any of the streetcar lines, such as the monuments.

Congress enacted the NHPA to encourage historic preservation in the United States in federal and federally-assisted projects. *Friends of St. Frances Xavier Cabrini Church v. FEMA*, 658 F.3d 460, 462 (5th Cir. 2011). The NHPA "requires each federal agency to take responsibility for the impact that its activities may have upon historic resources." *Coliseum Square Ass'n, Inc. v. Jackson*,

24

465 F.3d 215, 224 (5th Cir. 2006). Section 106 of the NHPA, now codified at 54 U.S.C. § 306108, prohibits federal agencies from approving the expenditure of federal funds on an undertaking without taking into account "the effect of the undertaking on any historic property." 54 U.S.C. § 306108. Section 106 upholds the NHPA's objectives "neither by forbidding the destruction of historic sites nor by commanding their preservation, but instead by ordering the government to take into account the effect any federal undertaking might have on them." *Coliseum Square Ass'n*, 465 F.3d at 225. The NHPA is procedural in nature. *Id.* "It does not itself require a particular outcome, but rather ensures that the relevant federal agency will, before approving funds or granting a license to the undertaking at issue, consider the potential impact of that undertaking on surrounding historic places." *Id.* (quoting *Bus. & Residents All. of E. Harlem v. Jackson*, 430 F.3d 584, 591 (2d Cir. 2005)).

When a government agency receives an application for a federally-assisted project—one in which federal funds will be used—the agency official evaluates the proposed federal action to determine whether it is an "undertaking" and, if so, whether it is a type of activity that has the potential to cause effects on historic properties. *Friends of Cabrini Church*, 658 F.3d at 463 (citing 36 C.F.R. § 800.3(a)). The term "undertaking" means a project, activity, or program funded in whole or in part under the

25

direct or indirect jurisdiction of a federal agency. 54 U.S.C. § 300320; 36 C.F.R. § 800.16(y). "If the undertaking is a type of activity that does not have the potential to cause effects on historic properties, . . . the agency official has no further obligations under section 106." 36 C.F.R. § 800.3(a)(1). Assuming the undertaking might affect historic properties, the agency begins the four-step review process mandated under section 106 of the NHPA. *Friends of Cabrini Church*, 658 F.3d at 463.

Agencies begin section 106 review by defining the area of potential effects ("APE"), which is the area where federally-funded activity will take place. *Id.* (citing 36 C.F.R. §§ 800.4(a), 800.16(d)). The agency evaluates the APE for historic value by identifying which properties or buildings in the APE are listed or eligible to be listed in the National Register of Historic Places. *Id.* (citing 36 C.F.R. § 800.4(c)). If there are historic properties in the APE, the agency must determine how the undertaking might affect these properties. *Id.* (citing 36 C.F.R. § 800.5). If the agency finds that there will be "no adverse effect," and the Advisory Council on Historic Preservation ("ACHP") concurs, review ends. *Id.* (citing 36 C.F.R. § 800.5(d)). If historic properties are likely to be adversely affected, the agency begins consultation with outside parties and the State Historic Preservation Office ("SHPO") to look for "alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse

effects on historic properties." *Id.* (quoting 36 C.F.R. § 800.6(a)). The ACHP has discretion to enter the section 106 process to ensure that the NHPA's historic preservation objectives are accomplished. *Id.* (citing 36 C.F.R. § 800.2(b)).

In the instant case, Plaintiffs' arguments in support of their claim under the NHPA mirror those in support of their claim under the DOT Act. The Federal Defendants claim that the required section 106 reviews occurred for the three federally-funded projects and resulted in a finding that each project would have no adverse effect on historic property. Further, the Federal Defendants assert that none of the monuments identified by Plaintiffs was within the APE for any of the three projects.[3] Lastly, the Federal Defendants argue that the funding of these projects bears no factual, legal, or causal nexus to the removal or persistence of the four monuments at issue.

Again, the Court agrees that Plaintiffs have not demonstrated any nexus between a federally-funded project or undertaking and the removal of the monuments at issue. Therefore, Plaintiffs again fail to demonstrate a likelihood of success on the merits of their NHPA claim.

---

[3] For example, the closest monument to the Loyola/UPT project is 0.4 miles away, and the closest monument to the Cemeteries Transit Center is located over one mile away. *Id.* at 3-4. Because the St. Charles Avenue streetcar refurbishment project only involved repair work to the movable streetcars and did not affect the streetcar tracks, rails, or route, the APE for that project was limited to the streetcars and did not encompass a geographical area in the City. *Id.* at 4.

### (3) *Veterans Memorial Preservation and Recognition Act*

The Veterans Memorial Preservation and Recognition Act ("VMPRA") makes it a criminal offense for a defendant to willfully injure or destroy any monument on public property commemorating the service of any person in the armed forces of the United States if, in committing the offense, the defendant uses an instrumentality of interstate or foreign commerce, or if the monument is located on property owned by, or under the jurisdiction of, the federal government. 18 U.S.C. § 1369. The VMPRA imposes a fine, imprisonment of not more than ten years, or both. *Id.*

Plaintiffs claim that Defendants' effort to move, remove, injure, or destroy the Lee Monument, Beauregard Monument, and Davis Monument is a violation of the VMPRA. Although the VMPRA is a federal criminal statute, Plaintiffs claim that individuals should be recognized as having a private right of action to enforce this statute because of the sensitivity of this issue and the large number of monuments erected across the country.

Decisions whether to prosecute or file criminal charges are generally within the prosecutor's discretion. Private citizens have "no standing to institute a federal criminal prosecution and no power to enforce a criminal statute." *Gill v. Texas*, 153 F. App'x 261, 262 (5th Cir. 2005) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)); *see also Chapa v. Adams*, 168 F.3d 1036, 1038 (7th Cir. 1999) ("Criminal statutes, which express

28

prohibitions rather than personal entitlements and specify a particular remedy other than civil litigation, are accordingly poor candidates for the imputation of private rights of action."); *W. Allis Mem'l Hosp., Inc. v. Bowen*, 852 F.2d 251, 254 (7th Cir. 1988) (noting the strong presumption against recognizing a private right of action under a criminal statute). For example, in *Serpentfoot v. Rome City Commission*, the Eleventh Circuit held that a state criminal statute, which made destruction of graves a felony, did not create a private civil cause of action. 322 F. App'x 801, 804 (11th Cir. 2009). Plaintiffs also have not demonstrated that the VMPRA can form the basis of a claim under 42 U.S.C. § 1983. *Frison v. Zebro*, 339 F.3d 994, 999 (8th Cir. 2003) ("[I]t is well-settled that criminal statutes will rarely survive § 1983 analysis.").

Even assuming Plaintiffs have standing to enforce the VMPRA, they have not made a prima facie showing that the removal of the monuments would violate the statute. First, Plaintiffs have not shown that any of the monuments commemorate "the *service* of any person . . . in the armed forces of the United States." 18 U.S.C. § 1369(a) (emphasis added).[4] Second, there is no basis to believe

---

[4] While it is undisputed that Robert E. Lee, P.G.T. Beauregard, and Jefferson Davis were members of the United States Army and served in the Mexican War, the monuments do not appear to commemorate that service. For example, the inscription on the base of the Lee Monument reads: ROBERT E. LEE/1807-1870/COMMANDER IN CHIEF/ CONFEDERATE STATES OF AMERICA/1861-1865 . . . ." (Rec. Doc. 26-1, at 2.) The Beauregard Monument depicts Beauregard astride his horse in full confederate uniform. *Id.* at 3. The inscription on the pedestal of the Beauregard Monument reads: "G.T. BEAUREGARD/1818-1883/GENERAL C.S.A./1861-

that the City will willfully injure or destroy the monuments; the City simply intends to remove and relocate them. Furthermore, Plaintiffs have offered no evidence to show that the monuments are located on federal land or that the City will orchestrate the removal of the monuments through interstate commerce. Accordingly, Plaintiffs have failed to demonstrate a likelihood of success on the merits of their claim under the VMPRA.

**B.  Federal Constitutional Claims**

In the second category, Plaintiffs assert claims under 42 U.S.C. § 1983, which creates a cause of action against anyone who "under color of any statute, ordinance, regulation, custom, or usage, of any State" violates another's constitutional rights. 42 U.S.C. § 1983. "To state a section 1983 claim, 'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (quoting *James v. Tex. Collin Cty.*, 535 F.3d 365, 373 (5th Cir. 2008)). Here, Plaintiffs claim that the decision to remove the monuments violates the constitutional guarantees of due process and equal protection of the laws.

---

1865." (Rec. Doc. 44, at 7.) Lastly, the inscription on the pedestal of the Davis Monument reads: "JEFFERSON DAVIS/PRESIDENT/CONFEDERATE STATES OF AMERICA/1861–1865 . . . ." *Id.* None of the monuments references service in the United States Army.

### (1)  *Equal Protection*

The Equal Protection Clause commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause 'is essentially a direction that all persons similarly situated should be treated alike.'" *Qutb v. Strauss*, 11 F.3d 488, 492 (5th Cir. 1993) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). The Equal Protection Clause is implicated "[o]nly if the challenged government action classifies or distinguishes between two or more relevant groups." *Id.* The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. *Cleburne Living Ctr.*, 473 U.S. at 440.

The Constitution presumes that "even improvident decisions will eventually be rectified by the democratic processes." *Id.* The Fourteenth Amendment does not give federal courts the "power to impose upon the States their views of what constitutes wise economic or social policy." *Dandridge v. Williams*, 397 U.S. 471, 486 (1970); *accord FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) ("[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.").

Plaintiffs argue that removing the monuments pursuant to City Code section 146-611 violates the Equal Protection Clause of the

31

Fourteenth Amendment because the City ignored other monuments that supposedly meet the criteria for removal. According to Plaintiffs, an equal application of section 146-611 would require removal of the Andrew Jackson Monument and the Buffalo Soldiers Monument. Because the City has taken no action to remove those monuments, Plaintiffs claim that they have been denied equal protection of the laws.

Here, the challenged ordinance does not distinguish between classes of individuals or groups. The monuments ordinance applies to all classes of citizens and it does not have a disparate impact on members of a suspect class. *See Leibowitz v. City of Mineola*, 660 F. Supp. 2d 775, 785–86 (E.D. Tex. 2009) (holding that city's barking ordinance did not deprive dog owner of equal protection, although animal owners could be treated differently depending on officer's interpretation of the ordinance, where the ordinance did not distinguish between classes of individuals or groups, it did not have a disparate impact on members of a suspect class, and it applied to all classes of citizens). The removal of the four monuments will affect all citizens in the same way.

Plaintiffs also argue that the City cannot constitutionally remove some offensive monuments unless it removes all offensive monuments. Plaintiffs essentially argue that all similarly situated monuments were not treated alike; however, the Equal Protection Clause ensures the equal protection of persons, not

32

monuments. Moreover, "the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge*, 397 U.S. at 486-87. "It is enough that the State's action be rationally based and free from invidious discrimination." *Id.* Here, the challenged ordinance meets that test. Therefore, Plaintiffs have failed to demonstrate a likelihood of success on the merits of their equal protection claim.

### (2) *Substantive Due Process*

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive a person of life, liberty or property without due process of law." U.S. Const. amend. XIV, § 1. The substantive component of the Due Process Clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450 (5th Cir. 1994) (quoting *Collins v. City of Harker Heights*, 506 U.S. 115, 125 (1992)). Accordingly, substantive due process looks to whether the government has sufficient justification for taking away a person's life, liberty, or property.

To state a cause of action under § 1983 for violation of the Due Process Clause, plaintiffs "must show that they have asserted a recognized 'liberty or property' interest within the purview of the Fourteenth Amendment, and that they were intentionally or

33

recklessly deprived of that interest, even temporarily, under color of state law." *Id.* (quoting *Griffith v. Johnston*, 899 F.2d 1427, 1435 (5th Cir. 1990)). If there is no denial of life, liberty, or property, then the government is not required to provide due process.

Plaintiffs initially claimed that the City's decision to remove the monuments deprived them of a fundamental liberty interest. In particular, Plaintiffs argued that the removal of the monuments will deprive them of their rights of free speech, free expression, and free association guaranteed by the First Amendment. However, during the preliminary injunction hearing, Plaintiffs abandoned this argument. Plaintiffs wisely chose not to pursue a freedom-of-speech claim, as the Supreme Court in *Pleasant Grove City v. Summum* held that "the placement of a permanent monument in a public park is best viewed as a form of government speech and is therefore not subject to scrutiny under the Free Speech Clause." 555 U.S. 460, 464 (2009). The Court reasoned that "[w]hen a government entity arranges for the construction of a monument, it does so because it wishes to convey some thought or instill some feeling in those who see the structure." *Id.* at 470. Indeed, "[g]overnments have long used monuments to speak to the public." *Id.* Further, a government entity "is entitled to say what it wishes" and "select the views that it wants to express." *Id.* at

467-68. Therefore, the removal of the monuments is a form of government speech and is exempt from First Amendment scrutiny.

Plaintiffs also assert that the Monumental Task Committee, Inc. ("MTC") and the Beauregard Camp No. 130, Inc. ("BC130") have constitutionally-protected property interests in the monuments. "Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).

Plaintiffs argue that MTC has a property interest in the monuments because it has been the only organization preserving the monuments in New Orleans for years. Plaintiffs claim that MTC "has donated volunteer services worth thousands of dollars each year" towards preserving the monuments. (Rec. Doc. 11-2, at 46.) Although Plaintiffs admit "MTC performed its work without expectation of remuneration," Plaintiffs argue that the volunteer services have a monetary value, which gives them a fundamental property right in the monuments. *Id.* at 46-47. Therefore, Plaintiffs claim that the removal of the monuments will deprive them of their property rights without due process of law.

In their reply, Plaintiffs raise an additional argument to support their claim that MTC acquired a property interest in the

monuments: the doctrine of *negotiorum gestio*. (Rec. Doc. 36, at 5.) *Negotiorum gestio*, which originated in Roman law, refers to the situation where a person voluntarily manages the affairs of another without authorization. Cheryl L. Martin, Comment, *Louisiana State Law Institute Proposes Revision of* Negotiorum Gestio *and Codification of Unjust Enrichment*, 69 Tul. L. Rev. 181, 185 (1994). At its inception, the action served the limited purpose of reimbursing a person who carried on litigation on behalf of an absent friend. *Id.* The concept is currently codified as article 2292 of the Louisiana Civil Code.[5] Article 2297 requires an owner whose affair has been managed to reimburse the manager for all necessary and useful expenses. La. Civ. Code art. 2297. Furthermore, *negotiorum gestio* is subject to the rules of mandate to the extent those rules are compatible with management of affairs. *Id.* art. 2293.

Plaintiffs rely on one rule of mandate in particular. Under article 3004, the mandatary "may retain in his possession sufficient property of the principal to pay the mandatary's expenses and remuneration." La. Civ. Code art. 3004. This provision is typically used to establish an attorney's right to retain client funds to pay the attorney's fees and expenses. *See, e.g.*, *Butchers'*

---

[5] "There is a management of affairs when a person, the manager, acts without authority to protect the interests of another, the owner, in the reasonable belief that the owner would approve of the action if made aware of the circumstances." La. Civ. Code art. 2292.

*Union Slaughter-House & Live-Stock Landing Co. v. Crescent City Live-Stock Landing & Slaughter-House Co.*, 6 So. 508, 510-12 (La. 1889) (holding that attorney had the right to retain client funds recovered in one lawsuit in order to pay fees and expenses owed for other cases in which the attorney had represented the client). However, one court interpreted this provision narrowly, holding that it permitted attorneys to retain client funds—not other property such as a client's papers and files. *In re Am. Metrocomm Corp.*, 274 B.R. 641, 658-59 (Bankr. D. Del. 2002) (applying Louisiana law).

The relationship between MTC and the City is not properly characterized as a *negotiorum gestio.* First, if the manager wishes to be reimbursed for his expenses, he must act with such expectation; *negotiorum gestio* does not apply "when the act is done in the spirit of liberality." Alfredo de Castro, Jr., Comment, *Negotiorum Gestio in Louisiana*, 7 Tul. L. Rev. 253, 256 n.31 (1933). Similarly, *negotiorum gestio* does not apply when the person who undertakes management acts in his own interest. La. Civ. Code art. 2292 cmt. (d). The person must undertake the management with the benefit of the owner in mind. *Kirkpatrick v. Young*, 456 So. 2d 622, 624-25 (La. 1984). Here, MTC donated its volunteer services and performed its work without expectation of remuneration. Therefore, the institution of *negotiorum gestio* should not apply.

37

In addition, the Louisiana Civil Code now makes clear that *negotiorum gestio* does not apply when the owner knowingly allows another to act on his behalf. *See* La. Civ. Code art. 2292. Because the manager must act "without authority," *negotiorum gestio* applies only if the owner has no knowledge of the undertaking. Martin, *supra*, at 191-92. Generally, an owner who knowingly allows another to act on his behalf should be deemed to have granted a tacit mandate. *Id.* at 191; *see also* La. Civ. Code arts. 2989, 2997. Because Plaintiffs allege that the City knew of MTC's volunteer efforts to preserve and protect the monuments, the relationship between MTC and the City is more properly characterized as a mandate.

Regardless of whether Plaintiffs rely on a theory of *negotiorum gestio* or mandate, the volunteer services donated by MTC do not support a property interest in the monuments. Even assuming article 3004 applies in such situation, the Louisiana Constitution expressly prohibits seizure of public property. La. Const. Art. 12, § 10. Therefore, Plaintiffs' remedy would be limited to reimbursement.

Next, Plaintiffs claim that BC130 has a property interest in the monuments as the successor to the original Sons of Confederate Veterans Camp chartered in 1899.[6] Plaintiffs argue that BC130's

---

[6] On April 24, 1899, the United Sons of Confederate Veterans issued a charter admitting Beauregard Camp No. 130 into membership with the United Confederation.

predecessor acquired a property interest in the monuments because it "raised and donated funds to erect the Beauregard Equestrian Monument and was active in the creation of the Jefferson Davis Monument." (Rec. Doc. 11-2, at 47.) Moreover, Plaintiffs argue that BC130's predecessor forwarded surplus funds to the Louisiana Historical Society, "presumably to maintain and support other monuments." *Id.*

Even assuming that Plaintiffs are able to establish that BC130 is a successor to the original Sons of Confederate Veterans Camp chartered in 1899, that would be insufficient to establish a property interest in the monuments. Plaintiffs admit that BC130's alleged predecessor "raised and *donated* funds" to erect the Beauregard Monument. (Rec. Doc. 11-2, at 47.) A donation, by definition, presently and irrevocably divests the donor of the thing given. La. Civ. Code art. 1468. Therefore, BC130's predecessor did not acquire a property interest in the monuments by donating the funds to erect the Beauregard Monument. The allegation that BC130's predecessor was active in the creation of the Davis Monument is also insufficient to create a property interest in the monuments.

The City argues that donated monuments erected on the City's public thoroughfares constitute public property subject to the

---

(Rec. Doc. 44, at 4.) BC130, one of the Plaintiffs in this case, is a nonprofit corporation that was incorporated in July 2006. *Id.*

City's control, citing *State ex rel. Singelmann v. Morrison*, 57 So. 2d 238, 244 (La. Ct. App. 1952). In *Singelmann*, the court held that the City of New Orleans had the right to permit erection of a privately-funded memorial to Mother Cabrini. *Id.* at 247. In doing so, the court made several determinations that are relevant to the instant case. First, the court determined that "[n]o individual or private association has the right to erect a memorial on public property without the consent of the governing authorities." *Id.* at 244. Second, the fact that private funds were used to construct the statue did not alter the court's analysis, because it is well established that "a municipality is legally authorized and has the capacity to receive and accept gifts of funds or property, including statues and memorials." *Id.* at 247. Third, the court determined that the "location, the manner and design of such a statue is within the sound discretion of the governing authorities of the City of New Orleans." *Id.* at 246. Lastly, the court determined that "[i]f any community in Louisiana has too many heroes to honor, or if memorial plaques should become plagues on its public buildings, *the local authority could require their removal*." *Id.* at 244 (emphasis added). Thus, the court's decision in *Singelmann* establishes the City's authority over the location and removal of monuments.[7]

---

[7] It is worth noting that the court in *Singelmann* listed a number of statues located around the City, including the Beauregard Monument, the Lee Monument,

Plaintiffs also argue that other entities acquired an interest in the land on which the monuments are erected. Specifically, Plaintiffs claim that the State of Louisiana, Beauregard Camp No. 130, the City Park Improvement Association, and the Lee, Beauregard, and Davis Monumental Associations acquired an interest in the land.[8] Plaintiffs argue that the City conveyed an interest in the land to the various monumental associations. For example, Plaintiffs rely on an 1877 ordinance in which the City granted "the use of Tivoli Circle to the Lee Monumental Association for the purpose of erecting therein a monument to Gen. Robert E. Lee." (Rec. Doc. 11-18, at 11.) The ordinance gave the Lee Monumental Association "the right to enter upon the ground within the present inclosure and prosecute such works as may be considered necessary for preparing the foundations of the monument, laying out and planting shrubbery, and performing all such work according to plan as may be adopted to carry out the object in view." *Id*. The ordinance provided that the work must be completed within five years. *Id.*

It is clear that the ordinance relied on by Plaintiffs does not establish that the Lee Monumental Association acquired an interest in the land on which the Lee Monument was erected. The

---

and the Davis Monument. 57 So. 2d at 241-42. Therefore, the court had the monuments at issue in mind when it decided that case.
[8] None of the entities listed are plaintiffs in the instant lawsuit, nor have any of those parties sought to intervene.

land on which the Lee Monument was erected was public property. *See Sarpy v. Municipality No. 2*, 9 La. Ann. 597, 599 (La. 1854); *see also* La. Civ. Code art. 454 (1870) ("Things which are for the common use of a city or other place, as streets and public squares, are likewise public things."). As early as 1810, it was well established that public things cannot be alienated or appropriated to private use. *Mayor of New Orleans v. Metzinger*, 3 Mart. (o.s.) 296 (La. 1814). Therefore, the City could not donate public property to the private entities listed by Plaintiffs. Plaintiffs assert similar arguments with regard to the Beauregard Monument[9] and Davis Monument.[10] However, these arguments lack merit for the reasons discussed above. Moreover, rather than establish that any of the Plaintiffs acquired an interest to the land on which the monuments were erected or the monuments themselves, Plaintiffs merely argue that certain exhibits "call into question who owns the monument[s]" and the land on which they sit. (Rec. Doc. 36, at

---

[9] For example, Plaintiffs claim that the New Orleans City Park Improvement Associated ("NOCPIA") committed itself to donate a site within City Park to the Beauregard Monumental Association for erection of the Beauregard Monument. Plaintiffs refer to a June 1905 letter from the NOCPIA to the Beauregard Monumental Association as evidence of this donation. (Rec. Doc. 11-18, at 12) ("I tender to you the site necessary for the Monument to [Beauregard]."). However, the City claims that the NOCPIA is a state entity that manages City Park and the land was not the state's to give. "[T]he property of City Park . . . has always belonged to the City of New Orleans." *City of New Orleans v. State*, 443 So. 2d 562, 570 (La. 1983). Plaintiffs have not disputed the City's argument.

[10] Plaintiffs claim that the City donated the land on which the Davis Monument is erected to the Davis Monumental Association in 1911. Plaintiffs rely on a February 1911 letter from the Mayor to the Davis Monumental Association. (Rec. Doc. 11019, at 3) (stating that the Mayor will be pleased to "publicly present the site of the [Davis Monument] to [the Davis Monumental] Association").

6.) Accordingly, Plaintiffs have failed to demonstrate a recognized property interest in the monuments within the purview of the Fourteenth Amendment, as required for a likelihood of success on the merits.

### (3)  *Procedural Due Process*

Procedural due process refers to the procedures the government must follow before it deprives a person of life, liberty, or property. "Procedural due process considers not the justice of a deprivation, but only the means by which the deprivation was effected." *Bowlby v. City of Aberdeen*, 681 F.3d 215, 222 (5th Cir. 2012). "[T]o determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate." *Id.* at 220 (alteration in original) (quoting *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)). The Supreme Court has held that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). In most cases, "a meaningful time" means prior to the deprivation of the liberty or property right at issue. *Bowlby*, 681 F.3d at 220 (citing *Zinermon*, 494 U.S. at 127).

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334. There are three distinct factors for a court to weigh

43

in considering whether the procedural due process provided is adequate: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Bowlby*, 681 F.3d at 220 (quoting *Mathews*, 424 U.S. at 335).

As discussed above, Plaintiffs have failed to demonstrate that they have a property interest in the monuments sufficient to require constitutionally adequate due process. However, even assuming that Plaintiffs were deprived of a constitutionally-protected property interest, Plaintiffs fail to demonstrate a likelihood that the process provided by the City was inadequate. Plaintiffs' procedural due process claim is based on their argument that the City's decision to remove the monuments under section 146-611 was "improvident and hasty" and has "no support in the evidence or the law." (Rec. Doc. 11-2, at 53.) However, it seems that Plaintiffs had an opportunity to be heard at a meaningful time and in a meaningful manner. In addition to soliciting reports and recommendations from various agencies and public officials, the City considered the removal of the monuments in two separate meetings including over six hours of public comment on the subject.

44

Further, it appears the Plaintiffs participated and spoke at the public meetings discussing the ordinance to remove the monuments. Thus, Plaintiffs were given a meaningful opportunity to be heard. *See Silas v. Babbitt*, 96 F.3d 355, 358 (9th Cir. 1996) ("The Constitution requires due process of law; it does not require an endless number of opportunities for one to assert his rights."). Accordingly, Plaintiffs have failed to demonstrate a likelihood of success on the merits of their procedural due process claims.

Plaintiffs also argue that removing the monuments pursuant to City Code section 146-611 denies Plaintiffs due process of the law because section 146-611 is unconstitutionally vague. The vagueness doctrine is an outgrowth of the Due Process Clause. *Munn v. City of Ocean Springs*, 763 F.3d 437, 439 (5th Cir. 2014). Vague laws offend due process in two respects. "First, they fail to provide the persons targeted by the statutes with 'a reasonable opportunity to know what conduct is prohibited so that [they] may act accordingly.'" *Okpalobi v. Foster*, 190 F.3d 337, 357-58 (5th Cir. 1999) (footnote omitted) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). "Second, by failing to provide explicit standards for those who apply them, vague laws 'impermissibly delegate basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.'" *Id.* at 358 (quoting *Grayned*, 408 U.S. at 108-09).

45

"The Due Process Clause requires that a law provide sufficient guidance such that a man of ordinary intelligence would understand what conduct is being prohibited." *Munn*, 763 F.3d at 439. The void-for-vagueness doctrine has been primarily employed to strike down laws that impose criminal sanctions. *Groome Res. Ltd., L.L.C. v. Parish of Jefferson*, 234 F.3d 192, 217 (5th Cir. 2000). In the civil context, "the statute must be 'so vague and indefinite as really to be no rule at all.'" *Id.* (quoting *Seniors Civil Liberties Ass'n, Inc. v. Kemp*, 965 F.2d 1030, 1036 (11th Cir. 1992)).

Applying this standard, the Court finds that Plaintiffs have failed to demonstrate a likelihood of success on the merits of their claim that section 146-611 is unconstitutionally vague. Section 146-611(b) provides that the City Council may cause the removal of a monument, statue, or other thing located outdoors on City property upon a finding that the thing constitutes a "nuisance" in that:

> (1) The thing honors, praises, or fosters ideologies which are in conflict with the requirements of equal protection for citizens as provided by the constitution and laws of the United States, the state, or the laws of the city and gives honor or praise to those who participated in the killing of public employees of the city or the state or suggests the supremacy of one ethnic, religious, or racial group over any other, or gives honor or praise to any violent actions taken wrongfully against citizens of the city to promote ethnic, religious, or racial supremacy of any group over another;

> (2) Has been or may become the site of violent
>     demonstrations or other activities that may
>     threaten life or property; and
> (3) Constitutes an expense for maintenance or the
>     provision of security on a recurring basis that is
>     unjustified when weighed against the historical or
>     architectural significance, if any, of the thing
>     and/or the merits of or reasons for outdoor display
>     of the thing.

New Orleans, La., Code of Ordinances § 146-611(b) (1995). In particular, Plaintiffs argue that section 146-611(b)(1) is overbroad, vague, poorly punctuated, and susceptible to more than one interpretation. (Rec. Doc. 11-2, at 49.) Plaintiffs also argue that section 146-611(b)(2) is vague and ambiguous because it makes the possibility of violent demonstrations in the future a reason to remove the monuments. *Id.*

Here, section 146-611 does not purport to regulate private conduct. It imposes neither criminal sanctions nor civil penalties. The ordinance does not proscribe any action. It merely sets forth guidelines and procedures by which the City may remove monuments, statues, plaques, or other structures from outdoor display on public property. Therefore, there is no prohibited conduct that the ordinance must reasonably convey. Although the ordinance vests some discretion in the City Council, that discretion is not impermissibly broad. Thus, Plaintiffs have failed to demonstrate a likelihood of success on the merits of their void-for-vagueness claim.

C.   **State Law Claims**

In the third category, Plaintiffs assert a claim that any effort to remove the monuments is barred by article XII, section 4 of the Louisiana Constitution. In addition, Plaintiffs claim that the City's plan to remove the monuments with funds provided by an anonymous donor violates the City's policy regarding donations. Plaintiffs also argue that the monuments ordinance does not satisfy the criteria set forth in City Code section 146-611(b). The Court has supplemental jurisdiction to hear Plaintiffs' state law claims.

**(1)  *Article XII, Section 4 of the Louisiana Constitution***

Article XII, section 4 of the Louisiana Constitution of 1974 recognizes the "right of the people to preserve, foster, and promote their respective historic linguistic and cultural origins." La. Const. art. XII, § 4. The driving force behind the provision was preservation of the French language and culture. Lee Hargrave, *"Statutory" and Hortatory" Provisions of the Louisiana Constitution of 1974*, 43 La. L. Rev. 647, 682 (1983). The law was supported primarily by French-speaking delegates who were concerned with the protection of the Acadian French culture. *Id.* No court has ever invalidated a law using this provision.

Professor Lee Hargrave suggested that the development and intent of article XII, section 4 support a narrow construction of the law. For example, the principal drafter's stated intent was

48

"to encourage bilingualism rather than make a drastic innovation." *Id.* at 684.   Moreover, an early proposal of the section expressly included certain rights:   "This includes the right of the people of a political subdivision to use the language or languages of their choice in their local schools and other public institutions. Private schools are free to teach in any language." *Id.* at 682-83.   However, these two sentences were deleted in committee. Therefore, although article XII, section 4 recognizes the right of the people to preserve and advance their language, "the development of the proposal indicates there would hardly be a right to have the public schools teach that language." *Id.* at 684.

Considering the legislative history, Hargrave argued that "[a]t best, this provision might been seen as a particularization of those principles protecting the rights of association that have been grafted onto the first amendment, encompassing a right to unite and associate for promotion of certain values and causes." *Id*. However, "as with its first amendment cousin, it is unlikely that the section would be invoked to protect all cultural origins." *Id*. For example, it would not permit a citizen who immigrated to Louisiana "to foster his origins by committing ritualistic robbery and murder." *Id*.   Thus, the rights covered by article XII, section 4 are "vague ones that can be balanced against other interests." *Id*.

Plaintiffs argue that the Defendants' effort to remove the Lee Monument, Beauregard Monument, and Davis Monument is a violation of the rights protected by article XII, section 4 of the Louisiana Constitution. According to Plaintiffs, the monuments were erected to preserve, foster, and promote the historic and cultural origins of the citizens of New Orleans and the residents of Louisiana. As discussed above, monuments displayed on public property typically represent government speech. *Pleasant Grove City*, 555 U.S. at 470. So, too, are privately financed and donated monuments that the government accepts for public display on government land. *Id.* at 470-71. Consequently, the placement or removal of a monument on public property is not subject to scrutiny under the First Amendment. *Id.* Thus, the removal of the monuments does not infringe upon Plaintiffs' First Amendment rights.

Similarly, Plaintiffs fail to demonstrate that the removal of the monuments will infringe upon their right to preserve, foster, and promote their historic, linguistic, and cultural origins. The City has the right to "speak for itself," and Plaintiffs may not compel the City to promote their culture. *Id.* at 467; *cf.* Hargrave, *supra*, at 684 (explaining that article XII, section 4 does not establish a right to have public schools teach particular historic, linguistic, and cultural origins). Thus, Plaintiffs fail to show a likelihood of success on the merits of their claim under article XII, section 4 of the Louisiana Constitution.

50

*(2)   The City Donation Policy*

Plaintiffs allege that the acceptance of an anonymous donation to fund the removal of the monuments violates City Policy Memorandum No. 125, which provides that an Act of Donation shall be used for "large donations" and conditional donations. (Rec. Doc. 11-20, at 8.) Plaintiffs cite a September 2015 letter from the City in response to a public records request, in which the City stated that it possessed no record containing the "name of the anonymous donor who pledged to pay for the removal of the four monuments." *Id.* at 4.

Plaintiffs' concerns about the donation are moot. The City has explained that funds for the removal are being donated by Foundation for Louisiana, a non-profit corporation. (Rec. Doc. 35-1, at 110.) The donation is documented in writing by an Act of Donation committing to provide up to $175,000 to cover costs associated with removal of the four monuments. *Id.* Thus, the donation complies with the City's policy. Furthermore, even if there had been no writing, Policy Memorandum No. 125 provides that any of its provisions may be waived with approval of the City's Chief Administrative Officer.

*(3)   City Code Section 146-611*

The ordinance to remove the monuments was enacted pursuant to City Code section 146-611, which provides a mechanism for removing public monuments on the grounds that they constitute a nuisance.

51

A monument is a "nuisance" if it satisfies three criteria: (1) the monument honors or fosters ideologies in conflict with the requirements of equal protection, honors those who participated in the killing of public employees, suggests the supremacy of one ethnic, religious, or racial group over another, or praises violence against citizens to promote ethnic, religious, or racial supremacy; (2) the monument has been or may become the site of violent demonstrations or criminal activity; and (3) the cost and expense of maintaining and securing the monument outweighs its historical or architectural significance. Code of Ordinances § 146-611(b).

Plaintiffs claim that the monuments ordinance does not satisfy the criteria set forth in section 146-611(b). "In reviewing the decisions of public bodies (the city council in the instant case), the courts will not interfere with the functions of these bodies in the exercise of the discretion vested in them unless such bodies abuse this power by acting capriciously or arbitrarily." *Herman v. City of New Orleans*, 158 So. 3d 911, 915 (La. App. 4 Cir. 2015) (quoting *Lake Terrace Prop. Owners Ass'n v. City of New Orleans*, 567 So. 2d 69, 74 (La. 1990)); *see also Shelton v. City of Coll. Station*, 780 F.2d 475, 477 (5th Cir. 1986) ("In the absence of invidious discrimination, suspect classifying criteria, or infringement of fundamental interests, our review of these quasi-legislative decisions is confined to whether the

decisions were 'arbitrary and capricious.'"). "Generally, 'capriciously' has been defined as a conclusion of a commission when the conclusion is announced with no substantial evidence to support it, or a conclusion contrary to substantiated competent evidence." *Herman*, 158 So. 3d at 915-16. "The word 'arbitrary' implies a disregard of evidence or the proper weight thereof." *Id.* at 916.

First, Plaintiffs do not argue that the City Council was arbitrary and capricious in concluding that the four monuments honor ideologies that are inconsistent with equal protection. Determining whether the monuments satisfy the requirements of subparagraph (b)(1) is no simple task. As the Supreme Court has explained, "The meaning conveyed by a monument is generally not a simple one like 'Beef. It's What's for Dinner.'" *Pleasant Grove City*, 555 U.S. at 474. "[M]onuments may be intended to be interpreted, and may in fact be interpreted by different observers, in a variety of ways." *Id.* Indeed, it frequently is not possible to identify a single "message" that is conveyed by a monument. *Id.* at 476. The monuments at issue in this case illustrate this phenomenon, as evidenced by the unprecedented public debate over their removal. However, the Court will not interfere with the reasoned conclusions of the City Council.

Second, Plaintiffs have not shown that the City Council was arbitrary and capricious in concluding that the monuments are the

sites of criminal activity and possible civil unrest. Plaintiffs argue that the City Council had no reasonable basis for concluding that the monuments have been or could become the site of crime or violence. However, the evidence before the City Council demonstrated that the monuments have been the sites of criminal activity and civil unrest. The monuments have been vandalized several times. (Rec. Doc. 35-1, at 22, 25.) For example, the Beauregard Monument was spray-painted with the words "Black Lives Matter" on both sides of its base in June 2015. *Id.* at 80. Likewise, the Lee Monument, Davis Monument, and Liberty Monument were defaced with graffiti in March 2012.[11] Furthermore, the Liberty Monument was the site of a violent protest in 1993. *Id.* at 25, 70. Thus, the City Council's conclusion regarding subparagraph (b)(2) is supported by the evidence.

Plaintiffs argue that the criminal activity around the monuments is the product of "the Mayor's inflammatory rhetoric rather than a groundswell of public opposition to the monuments." (Rec. Doc. 11-2, at 51.) However, this argument lacks merit. The impetus behind the vandalism is irrelevant. Moreover, there is evidence that the monuments have been vandalized long before the Mayor called for their removal. Next, Plaintiffs argue that the

---

[11] Under section 54-151 of the City's Criminal Code, the act of placing graffiti upon real or personal property, whether publicly or privately owned, without consent of the owner, constitutes criminal damage to property. Code of Ordinances § 54-151(b)(1)(a).

monuments are no more an object of vandalism than are other properties in the City. *Id.* Again, this argument lacks merit. The comparative rate of vandalism is irrelevant. Subparagraph (b)(2) does not require that the criminal activity at a particular monument exceed levels found in other parts of the City. Lastly, Plaintiffs argue that no violent demonstrations have taken place recently, noting that the evidence of civil unrest at the Liberty Monument occurred twenty-three years ago. Subparagraph (b)(2) simply requires that the monument has been the site of violent demonstrations, regardless of how long ago such activities occurred. Therefore, Plaintiffs fail to show that the City Council acted arbitrarily or capriciously in determining that subparagraph (b)(2) was satisfied.

Third, Plaintiffs have not shown that the City Council was arbitrary and capricious in concluding that the costs of maintaining the monuments outweigh the benefits of keeping them. Plaintiffs argue that the City spends very little on the monuments because MTC has assumed the responsibility of maintaining the monuments since 1989. However, Plaintiffs' argument lacks merit. Subparagraph (b)(3) refers to the total expenses for maintenance and security, not the net costs to the City. As the City points out, there is no guarantee that MTC will continue to gratuitously bear the cost of maintaining the monuments in the future.

Furthermore, Plaintiffs' arguments focus only on the costs of maintenance. Subparagraph (b)(3) does not turn on whether the costs of maintenance are significant; but rather, it turns on a determination of whether those expenses are justified by the historical and architectural significance of the monuments. The City maintains that one could compellingly argue that any money spent maintaining the monuments is unjustified by the monuments' origins.  The City Council concluded that the costs outweigh the benefits, and Plaintiffs have not demonstrated reason for the Court to interfere with that conclusion. Accordingly, Plaintiffs fail to show a likelihood of success on the merits of their claim regarding the application of City Code section 146-611.

In sum, Plaintiffs have established only that they disagree with the City's action, not that the City abused its power. This Court, however, "has nothing to do with the question of the wisdom or good policy of municipal ordinances. If they are not satisfying to a majority of the citizens, their recourse is to the ballot—not the courts." *Palermo Land Co. v. Planning Comm'n of Calcasieu Par.*, 561 So. 2d 482, 491 (La. 1990) (quoting *State ex rel. Civello v. City of New Orleans*, 97 So. 440, 444 (La. 1923)).

### D.  Liberty Monument Consent Order

Nearly twenty-five years ago, litigation concerning the temporary removal and re-erection of the Liberty Monument occurred in the Eastern District of Louisiana. *See Shubert v. Kemp*, No. 91-

56

4446 (E.D. La. filed Dec. 9, 1991) (McNamara, J.). Louisiana Landmarks Society, one of the Plaintiffs in the instant case, intervened in that action. The litigation resulted in a consent order from Judge McNamara that "no later than January 20, 1993, the City shall complete the actual re-erection of the Liberty Monument." (Rec. Doc. 20-27, at 4.). Plaintiffs argue that the removal of the Liberty Monument violates the consent order agreed to by the City.

City Code section 146-611(e) sets forth the procedure for removing a monument when such removal would implicate an existing judgment or court order:

> Whenever in the opinion of the city attorney removal of
> a thing is required by an ordinance of the council but
> such removal would apparently violate or conflict with
> . . . a judgment or order entered by a federal or state
> court, the city attorney shall notify the city council
> and file an appropriate action or proceeding . . .
> seeking a decision, declaration or order compelling or
> permitting such removal. The obligation of removal
> imposed by the ordinance shall be suspended until a
> favorable definitive judgment is obtained.

Code of Ordinances § 146-611(e).

The City states that it understands *Shubert v. Kemp* may have imposed legal restrictions concerning removal of the Liberty Monument, and it intends to seek court approval to allow the ordinance to be enforced. (Rec. Doc. 35-1, at 32-33.) The City was not able to continue under section 146-611(e) because Plaintiffs filed the instant lawsuit within hours of the City Council's vote.

Nevertheless, the City intends to move forward with removal of the Liberty Monument pursuant to the process set forth in section 146-611(e). Therefore, regardless of the Court's decision with respect to the Lee Monument, Beauregard Monument, and Davis Monument, the City cannot remove or relocate the Liberty Monument without obtaining relief from the order and final judgment in *Shubert*.

In their reply, Plaintiffs advance an additional argument under section 146-611(e) with respect to the Lee Monument, Beauregard Monument, and Davis Monument. According to Plaintiffs, because the City employed a single ordinance to seek removal of all four monuments, none of the monuments can be removed until the City obtains an order permitting removal of the Liberty Monument. (Rec. Doc. 36, at 8.) In short, because the City did not employ a separate ordinance for the removal of the Lee Monument, Beauregard Monument, and Davis Monument, Plaintiffs contend that none of the monuments can be removed without first obtaining relief from the *Shubert* order and judgment.

Resolution of Plaintiffs' claim turns on the interpretation of section 146-611(e). Under Louisiana law, "[t]he statutory and jurisprudential rules for the construction and interpretation of state statutes are applicable to the construction and interpretation of municipal and parochial ordinances." *City of New Orleans v. BellSouth Telecomms., Inc.*, 690 F.3d 312, 322 (5th Cir. 2012) (alteration in original) (quoting *Bunch v. Town of St.*

*Francisville*, 446 So. 2d 1357, 1360 (La. App. 1 Cir. 1984)). When an ordinance is clear and unambiguous and its application does not lead to absurd consequences, it must be given effect as written. La. Civ. Code art. 9; La. Rev. Stat. § 1:4; *Bunch*, 446 So. 2d at 1360. When the words of an ordinance are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole. La. Civ. Code art. 12. When the language of the ordinance is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to its purpose. *Id.* art. 10; *see also Bunch*, 446 So. 2d at 1360 ("When interpreting a law (ordinance), the court should give it the meaning the lawmaker intended.").

Here, Plaintiffs argue that the last sentence of section 146-611(e) states in clear terms that the removal of all four monuments shall be suspended until a favorable, definitive judgment is obtained permitting the removal of the Liberty Monument. The Court disagrees. Under section 146-611(e), "[t]he obligation of removal imposed by the ordinance shall be suspended until a favorable definitive judgment is obtained." Plaintiffs argue that the "obligation of removal" refers to all monuments covered by the ordinance, rather than only those that are protected by a court order. However, Plaintiffs' interpretation would lead to absurd consequences. Section 146-611(e) refers to the situation where "removal of a thing is required by an ordinance . . . but *such*

59

*removal* would apparently violate . . . a judgment or order entered by a federal or state court." Accordingly, considering the context in which the phrase occurs and the text of section 146-611(e) as a whole, the Court concludes that the "obligation of removal" refers only to the removal that would apparently violate a court order.

For the foregoing reasons, even assuming *arguendo* that Plaintiffs have demonstrated that they face a likelihood of irreparable harm, the Court nevertheless concludes that a preliminary injunction must be denied because Plaintiffs have failed to demonstrate that they will likely succeed on the merits of any of their claims.

3.   **Balance of Harms and Service of the Public Interest**

Finally, in order to obtain a preliminary injunction, Plaintiffs must also establish that their substantial injury outweighs the threatened harm to the party whom they seek to enjoin and that granting the preliminary injunction will not disserve the public interest. This requires a balancing of harms to the parties, which involves an evaluation of the severity of the impact on the defendant should the temporary injunction be granted and the hardship that would occur to the plaintiff if the injunction should be denied. In addition, the court must consider whether an injunction would injure the public interest. However, there is no need to weigh relative hardships which a preliminary injunction or

the lack of one might cause the parties unless the plaintiff can show some likelihood of ultimate success. *Seatrain Int'l*, 518 F.2d at 180.

Plaintiffs argue that the balance of equities tips in their favor because the monuments have stood for a century or longer. Plaintiffs ask, "What is the harm if the City is required to wait until resolution of this matter?" (Rec. Doc. 11-2, at 28.) Because Plaintiffs have failed to demonstrate a likelihood of success, the Court need not weigh the relative harms to the parties or consider the public interest. Nevertheless, the Court notes that the Fifth Circuit has held that "[w]hen a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013). Similarly, Chief Justice Roberts has explained that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, Circuit Justice). Therefore, the balance of harms does not weigh strongly in favor of an injunction.

The Court is well aware of the emotion and passions that are involved in this case; however, this is a court, not a political body like the City Council. The Court does not judge the wisdom, or lack thereof, of the actions taken by the Mayor or the City

Council. The only issue before the Court is a legal one: Does the City's newly passed ordinance violate Plaintiffs' statutory or constitutional rights? The instant motion asks the Court to determine simply whether the Plaintiffs have shown that they are entitled to the extraordinary remedy of a preliminary injunction. For the foregoing reasons, the Court concludes that they have not. Therefore, the motion for a preliminary injunction must be denied.

**CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' *Motion for Temporary Restraining Order and Preliminary and Permanent Injunctive Relief* **(Rec. Doc. 11)** is **DENIED**.

New Orleans, Louisiana, this 26th day of January, 2016.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE