UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MONUMENTAL TASK                          CIVIL ACTION
COMMITTEE, INC., ET AL.

VERSUS                                   NO: 15-6905

ANTHONY R. FOXX, ET AL.                  SECTION: "J"(3)


## ORDER & REASONS

Before the Court is the City of New Orleans and Mayor Mitchell J. Landrieu's ("the City") *Motion for Partial Summary Judgment* (R. Doc. 138), Plaintiffs' response thereto (R. Doc. 144), and the City's reply (R. Doc. 150). Having considered the motion and legal memoranda, the record, and the applicable law, the Court finds that City's motion should be **GRANTED**.

## FACTS AND PROCEDURAL BACKGROUND

This case arises from the New Orleans City Council's ("City Council") decision to remove three monuments honoring Confederate leaders and a fourth commemorating an 1874 battle between the White League and the City of New Orleans' first integrated police force. On June 26, 2015, Mayor Landrieu called upon the City Council to initiate the process of removing these four public monuments. On July 9, 2015, following remarks from Mayor Landrieu in support of removing the monuments and soliciting recommendations from various City agencies regarding whether the monuments should be deemed a

nuisance and removed from public property, the City Council adopted a resolution. On December 1, 2015, the City Council introduced an ordinance providing for the removal of the monuments. On December 17, 2015, the City Council affirmatively voted to remove the monuments, and the ordinance was signed into law. Plaintiffs filed suit on the same day seeking a preliminary injunction to enjoin the City from relocating the monuments. On January 26, 2016, this Court entered an Order and Reasons denying Plaintiffs' motion for preliminary injunction. Plaintiffs appealed this Court's denial of their preliminary injunction to the Fifth Circuit on February 4, 2016. Thereafter, on March 6, 2017, the Fifth Circuit affirmed this Court's decision denying Plaintiffs' motion for preliminary injunction. In short, the Fifth Circuit held that Plaintiffs failed to demonstrate a constitutionally or otherwise legally protected interest in the Robert E. Lee Monument, the P.G.T. Beauregard Equestrian Monument, and the Jefferson Davis Monument. *Monumental Task Comm., Inc. v. Chao*, No. 16-30107 (5th Cir. Mar. 6, 2017).

Plaintiffs' present motion relates to the Liberty Place Monument. The Liberty Place Monument sits at the river side of Iberville Street in New Orleans, Louisiana. The monument commemorates the 1874 battle between the White League and the City of New Orleans' first integrated police force. This is not the first time the Liberty Place Monument has been subject to litigation in this Court. In the 1980s, the City of New Orleans

2

accepted a Housing and Urban Development ("HUD") grant to subsidize road improvements on Canal Street. Because this federally funded project required the removal of the Liberty Place Monument, an impact analysis was conducted pursuant to Section 106 of the National Historic Preservation Act ("NHPA"). The City agreed to re-erect the monument by September 1, 1991, but failed to do so by that date. As a result, Francis Shubert sought an injunction ordering the City to release and re-erect the Liberty Monument in its former location.[1] The parties came to an agreement and jointly filed a pleading captioned "Stipulations and Consent Order" ("*Shubert* Consent Order" or "Consent Order"). (R. Doc. 138-3, at 112-117.) The *Shubert* Consent Order contained the following stipulations:

> (1) [By no] later than October 28, 1992, the City would conclude its negotiations the Louisiana State Historic Preservation Officer concerning the boundaries of the site selection area determined to be historically appropriate to the site of the Battle of Liberty Place;
> (2) [By no] later than December 9, 1992, the City would pick a site within the designated site selection area on which to re-erect the Liberty Monument; and
> (3) [By no] later than January 20, 1993, the City would complete the actual re-erection of the Liberty Monument.

*Id.* By April 1993, the Liberty Place Monument was replaced. The *Shubert* court then held that the City of New Orleans had complied with the *Shubert* Consent Order, and the court refused to become enmeshed in other disputes beyond the Consent Order. *Id.*

---

[1] *Shubert v. Kemp*, No. 91-4446, 1992 WL 28092 (E.D. La. Feb. 3, 1992).

The City now seeks to remove the Liberty Place Monument pursuant to the New Orleans Public Monuments Ordinance ("Monuments Ordinance").[2] Plaintiffs assert that the *Shubert* Consent Order prohibits the City from removing the Liberty Place Monument pursuant to the Monuments Ordinance. (R. Doc. 1; R. Doc. 144.) Further, Plaintiffs argue that removing the Liberty Place Monument violates Section 106 of the NHPA, Plaintiffs' due process rights under the Fifth and Fourteenth Amendments to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and article XII, § 4 of the Louisiana Constitution. (R. Doc. 1, at 29-31.) In response, the City filed the present *Motion for Partial Summary Judgment* arguing that the planned removal of the Liberty Place Monument does not violate the *Shubert* Consent Order, the NHPA, nor Plaintiffs' constitutional rights. (R. Doc. 138-1.) The City's motion is now before the Court on the briefs and without oral argument.

## PARTIES' ARGUMENTS

### 1.    The City's Arguments

First, the City argues that removing the Liberty Place Monument pursuant to the Monuments Ordinance does not violate the *Shubert* Consent Order. (R. Doc. 138-1, at 7.) Specifically, the

---

[2] New Orleans, La., Code of Ordinances § 146-611(b).

City asserts that the Consent Order obligated the City to do three things: (1) work with the Louisiana State Historic Preservation Officer ("SHPO") to determine an area historically appropriate to the site of the Battle of Liberty Place; (2) pick a site within that area to re-erect the monument; and (3) re-erect the monument by January 20, 1993. *Id.* at 7-8. The City argues that the *Shubert* court specifically determined that the City complied with the *Shubert* Consent Order when it restored the monument in 1993. *Id.* Further, the City argues that the *Shubert* Consent Order does not prohibit the City from removing the monument after it was re-erected. *Id.* at 8. "It required simply that the City fulfill its promise to re-erect the monument when the Canal Street road work was complete—a requirement imposed by the NHPA as a pre-condition to accepting HUD funds." *Id.*

Second, the City argues that removing the Liberty Place Monument does not violate the NHPA. (R. Doc. 138-1, at 10.) The City argues that a one-time receipt of federal funds does not permanently "federalize" historic local properly and divest the local government of its police powers. *Id.* Finally, as to Plaintiffs' remaining constitutional claims, the City incorporates all of the arguments it presented in its previous *Motion for Summary Judgment* (R. Doc. 63).[3] *Id.* at 12. The City asserts that

---

[3] As will be addressed in detail below, the City's previous *Motion for Summary Judgment* argued, with respect to the Liberty Place Monument, that Plaintiffs'

Plaintiffs do not have a constitutionally protected right in the Liberty Place Monument and cannot demonstrate that removal of the monuments will infringe upon their right to preserve their historic and cultural origins. (R. Doc. 63, at 14-19.)

## 2.   Plaintiffs' Arguments

Plaintiffs first argue that the Court should defer ruling on the City's motion because depositions, answers to interrogatories, admissions, and affidavits are unavailable. (R. Doc. 144, at 2.) Plaintiffs argue that none of this information is available to them "because this Court suggested the defendants should file dispositive motions before plaintiffs had an opportunity to conduct discovery."[4] *Id.* Second, Plaintiffs argue that the City has chosen the wrong vehicle for the relief it seeks. Plaintiffs aver that the City must overturn the *Shubert* Consent Order or seek relief in the *Shubert* case itself under Rule 60(b) of the Federal Rules of Civil Procedure. *Id.* Plaintiffs argue that such action would be futile because there has been no significant change in the law or facts that would permit the City to withdraw from the *Shubert* Consent Order. *Id.* at 3. Accordingly, Plaintiffs argue that the City's motion should be denied, and any issues relating

---

Equal Protection, Due Process, and Louisiana state law claims should be dismissed. (R. Doc. 63.)

[4] Plaintiffs provide no support for this contention. Further, this Court has already denied *Plaintiffs' Motion to Continue the Submission Date on the City's Motion for Partial Summary Judgment*. (R. Doc. 148.) Plaintiffs have failed to demonstrate how the discovery requested would create a genuine issue of material fact. *Id.* at 3. Accordingly, the Court shall not delay ruling on the City's motion in order to permit Plaintiffs to conduct additional discovery.

to the *Shubert* Consent Order must be litigated in that case after it is reopened and re-allotted. *Id.*

3.   **The City's Reply to Plaintiffs' Arguments**

In response to Plaintiffs' opposition, the City argues that the *Shubert* Consent Order is clear and unambiguous, and as such, there is no need for additional discovery. (R. Doc. 150, at 3.) The City argues that the Plaintiffs' position is premised on the argument that the *Shubert* Consent Order obliges the City to keep the Liberty Place Monument at its current location in perpetuity. *Id.* The City asserts that if any such obligation exists, it would be found in the *Shubert* Consent Order itself, not in additional discovery. *Id.* Moreover, the City argues that Plaintiffs have had ample opportunity to obtain any information they believed was necessary through discovery, but have elected not to do so. *Id.* at 5. Finally, the City argues that its motion is not a collateral attack on the *Shubert* Consent Order; therefore, Federal Rule 60 is inapplicable, and the City's promise to re-erect the Liberty Place Monument as a condition to a small federal road grant twenty years ago cannot serve to permanently divest the City of its inherent authority to regulate its property and abate nuisances. *Id.*

<u>**LEGAL STANDARD**</u>

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g.*, *id.* at 325; *Little*, 37 F.3d at 1075.

## DISCUSSION

### 1. Whether Removing the Liberty Place Monument Violates the *Shubert* Consent Order

The *Shubert* Consent Order required the City to take three actions: (1) determine the proper boundaries of the Battle of Liberty Place; (2) designate an area within those boundaries to re-erect the Liberty Place Monument; and (3) re-erect the Liberty Place Monument by January 20, 1993. (R. Doc. 138-3, at 103.) The City argues that nothing within the plain language of the *Shubert* Consent Order is ambiguous, and that the Consent Order does not require the City to retain the Liberty Place Monument in perpetuity. (R. Doc. 138-1, at 7.) Plaintiffs' only argument in opposition is that the City must seek relief in the *Shubert* case

9

itself under Rule 60(b). (R. Doc. 144, at 2-3.) The Court finds that such action is unnecessary, and that the City has utilized the appropriate venue for relief in this Court. Accordingly, the Court must interpret the *Shubert* Consent Order and determine its requirements.

"Consent orders are interpreted as contracts and are to be construed only by reference to the 'four corners' of the order itself." *Robinson v. Vollert*, 602 F.2d 87, 93 (5th Cir. 1979) (interpreting a settlement agreement as a contract); *see also Abdelhak v. City of San Antonio,* 509 F. App'x 326, 329 n.6 (5th Cir. 2013) (same). "Reference to extrinsic evidence, such as the circumstances of formation, is only permissible if the order is ambiguous in some respect." *Robinson*, 602 F.2d at 93 (citing *U.S. v. ITT Cont'l Baking Co.*, 420 U.S. 223 (1975); *United States v. Armour & Co.*, 402 U.S. 673 (1971)). "A determination of whether a contract is ambiguous and the interpretation of a contract are questions of law." *Reliant Energy Servs. v. Enron Canada Corp.*, 349 F.3d 816, 821 (5th Cir. 2003) (citing *Stinnet v. Colo. Interstate Gas Co.*, 227 F.3d 247, 254 (5th Cir. 2000)). When a contract is expressed in unambiguous language, its terms will be given their plain meaning and will be enforced as written. *Certain Underwriters at Lloyd's London v. C.A. Turner Constr. Co.*, 112 F.3d 184, 186 (5th Cir. 1997). When interpreting a contract, the focus is the parties' intent, because courts are compelled to give

10

effect to the parties' intentions. *Pennzoil Co. v. FERC*, 645 F.2d 360, 388 (5th Cir. 1981). To determine intent, a court must look to the plain language of the contract and its purposes. *See id.*

The Court finds that the *Shubert* Consent Order is not ambiguous. Further, nothing within the plain language of the *Shubert* Consent Order prohibits the City from removing the Liberty Place Monument. The *Shubert* Consent Order only required the City to determine the historically appropriate boundaries for the monument, select a site within such boundaries to re-erect the monument, and re-erect the monument. *See* (R. Doc. 138-3, at 103.) Moreover, even if the *Shubert* Consent Order prohibited the City from later-removing the monument, such agreement may be deemed void or absolutely null because the City cannot contract away its police powers. *See Abdelhak*, 509 F. App'x at 329 n.6 (citing *Vulcan Materials Co. v. City of Tehuacana*, 369 F.3d 882, 887 (5th Cir. 2004) (noting that ordinances aimed at protecting the health and safety of citizens are squarely within the city's police powers); *State v. Canal & C.R. Co.*, 24 So. 265, 268 (La. 1898) ("It is evident that the city cannot barter away her police powers; nor can she by her contracts estop herself from exercising the power of suppressing *nuisances* or preserving the public health and the comfort and cleanliness of the inhabitants of the city.") (emphasis added).

In *Abdelahak v. City of San Antonio*, the plaintiff owned property on which he operated a mobile home trailer park. 509 F. App'x at 327. The plaintiff's property was located within the Federal Emergency Management Administration 100-year floodplain, which imposes restrictions on developments in flood-risk areas. *Id.* In 1999, the plaintiff's property was flooded and the City of San Antonio ordered the plaintiff to shut down the park pending compliance with specific public safety requirements. *Id.* The plaintiff filed suit to enjoin the city's action, but, in 2005 the parties consummated a settlement[5] and agreed that the plaintiff could obtain any mobile home permits on the property to which he was legally entitled. *Id.* In 2007, the plaintiff's property flooded again. *Id.* The city temporarily ceased electrical services to the park and ultimately stopped issuing new permits for electrical hookups to future tenants. *Id.* The plaintiff filed suit arguing, *inter alia*, that the city breached the terms of the 2005 settlement agreement. *Id.* at 328. The plaintiff argued that the terms of the settlement agreement effectively exempted his property from the city's regulations. *Id.* In interpreting the settlement agreement, the court stated that it "does not tend to demonstrate that the City intended to 'contract away' its power to enforce public safety

---

[5] The settlement agreement provided that the city would "restore to [Abdelhak] all of the permits for mobile home spaces that [he] may lawfully place upon his property and still be in compliance with all applicable code requirements applicable to all mobile home parks." *Abdelhak*, 509 F. App'x at 327 n.2.

regulations on the property from that point on. . . . The ability to protect the health and safety of residents . . . is of extreme importance. Ordinances aimed at protecting the health and safety of citizens are squarely within the City's police powers. [] *The settlement cannot be read as rescinding that authority*." *Id.* at 329 n.6 (emphasis added).

Thus, the *Shubert* Consent Order cannot be read as rescinding the City's authority to remove the Liberty Place Monument pursuant to the Monuments Ordinance. *See id.; see also Boston Beer Co. v. State of Mass.*, 97 U.S. 25, 33 (1877) ("Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health, and property of the citizens and to the preservation of good order and public morals. The legislature cannot, by any contract, divest itself of the power to provide for these objects."); *Vt. Dep't of Pub. Serv. v. Mass. Mun. Wholesale Elec. Co.*, 558 A.2d 215, 220 (Vt. 1988) ("Therefore, if a public corporation enters into a contract that barters away or otherwise restricts the exercise of its legislative or police powers, then the contract is ultra vires and void ab initio."); *P.C.B. P'ship v. City of Largo*, 549 So. 2d 738, 742 (Fla. 2d Dist. Ct. App. 1989) (noting that a municipality cannot limit its police power by contract). Accordingly, the Court holds that the *Shubert*

Consent Order does not prohibit the City from removing the Liberty Place Monument.

2.  **Whether Removing the Liberty Place Monument Violates the NHPA**

Congress enacted the National Historic Preservation Act to encourage historic preservation in the United States in federal and federally-assisted projects. *Friends of St. Frances Xavier Cabrini Church v. FEMA*, 658 F.3d 460, 462 (5th Cir. 2011). The NHPA "requires each federal agency to take responsibility for the impact that its activities may have upon historic resources." *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 224 (5th Cir. 2006). Section 106 of the NHPA, now codified at 54 U.S.C. § 306108, prohibits federal agencies from approving the expenditure of federal funds on an undertaking without taking into account "the effect of the undertaking on any historic property." Section 106 upholds the NHPA's objectives "neither by forbidding the destruction of historic sites nor by commanding their preservation, but instead by ordering the government to take into account the effect any federal undertaking might have on them." *Coliseum Square Ass'n*, 465 F.3d at 225. The NHPA is procedural in nature. *Id.* "It does not itself require a particular outcome, but rather ensures that the relevant federal agency will, before approving funds or granting a license to the undertaking at issue, consider the potential impact of that undertaking on surrounding historic places." *Id.* (quoting *Bus. & Residents All. of E. Harlem*

14

*v. Jackson*, 430 F.3d 584, 591 (2d Cir. 2005)). When a government agency receives an application for a federally-assisted project, *i.e.*, one in which federal funds will be used, the agency official evaluates the proposed federal action to determine whether it is an "undertaking" and, if so, whether it is the type of activity that has the potential to affect historic properties. *Friends of St. Frances Xavier Cabrini Church*, 658 F.3d at 463 (citing 36 C.F.R. § 800.3(a)). The term "undertaking" means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a federal agency. 54 U.S.C. § 300320; 36 C.F.R. § 800.16(y). "If the undertaking is a type of activity that does not have the potential to cause effects on historic properties, . . . the agency official has no further obligations under section 106." 36 C.F.R. § 800.3(a)(1). If the undertaking might affect historic properties, the agency begins the four-step review process mandated under section 106 of the NHPA. *Friends of St. Frances Xavier Cabrini Church*, 658 F.3d at 463.

The City's removal of the Liberty Place Monument does not violate Section 106 of the NHPA. As recently noted by the District of Columbia Circuit, Section 106 "applies by its terms only to federally funded or federally licensed undertakings." *Nat'l Min. Ass'n v. Fowler*, 324 F.3d 752, 760 (D.C. Cir. 2003) (quoting *Sheridan Kalorama Historical Ass'n v. Christopher*, 49 F.3d 750, 755 (D.C. Cir. 1995)). Unless the City's efforts to remove the

Liberty Place Monument are either federally funded or federally licensed, Section 106 does not apply. *See Sheridan Kalorama*, 49 F.3d at 755-766. Plaintiffs have not argued, let alone presented any evidence, that removal of the Liberty Place Monument may be federally funded, permitted, approved, or licensed. Accordingly, Section 106 is inapplicable to the removal of the Liberty Place Monument.

Nevertheless, and despite Plaintiffs' failure to brief this issue, the Court shall attempt to address Plaintiffs' assertion that the City must initiate a Section 106 review prior to removing the Liberty Place Monument because the monument was previously moved pursuant to federal funds. (R. Doc. 1, at 3.) As explained below, this argument also fails.

A brief summary of the previous removal of the Liberty Place Monument will help place the Plaintiffs' argument in context. Around 1990, the City of New Orleans received an Urban Development Action Grant to improve traffic flow and streets in close proximity to the Liberty Place Monument. *See* (R. Doc. 138-3, at 45.) Because it was federally funded, the project was considered a federal undertaking. Out of an abundance of caution, the Liberty Place Monument was removed to avoid any adverse effects on the monument.[6]

---

[6] "Adverse effects" include: Physical destruction of or damage to all or part of the property; Removal of the property from its historic location; Introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features. 36 C.F.R. § 800.5(a)(2)(i),(iii),(v).

Prior to removing the monument, the City of New Orleans, through former Mayor Sidney Barthelemey, entered into a Memorandum of Agreement ("MOA")[7] with the Louisiana State Historic Preservation Officer ("SHPO"), Leslie P. Tassin. *See* (R. Doc. 138-3, at 40-44.) The MOA between the City of New Orleans and the SHPO consisted of letters exchanged between Mayor Barthelemey and the SHPO. On October 20, 1989, Mayor Barthelemey submitted a proposed agreement to the SHPO and requested that the SHPO submit a finding of "no adverse effect" so the City could proceed to fix the streets near the Liberty Place Monument. (R. Doc. 138-3, at 40.) The City agreed to the following in exchange for the SHPO issuing a finding of "no adverse effect":

> (1)  To have the [Liberty Place Monument] carefully dismantled under the supervision of the Historic District Landmarks Commission, stored either in a bonded warehouse or equivalent facility and re-erected by May 1, 1991, unless the City and State mutually agree to extend the date.

> (2)  To suggest a new site mutually agreed to by the City and the SHPO and within the area determined to be historically appropriate to the site of the [Battle of Liberty Place.] This would be the area in which research shows the main portion of the "Battle" which

---

[7] An MOA is executed between the City, when it uses federal funds for a project, and the SHPO to plan to avoid or mitigate any adverse effects on historic property eligible for inclusion in the National Register. *See Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd.*, 252 F.3d 246, 253-254 (3d Cir. 2001) (citing 36 C.F.R. § 800.5(a)(1)) (explaining that an adverse effect occurs when an undertaking alters, directly or indirectly, any of the characteristics that make a property historic and eligible for inclusion in the National Register). "An executed MOA evidences the agency's compliance with § 106 of the NHPA and governs the carrying out of the federal undertaking." *Id.* at 254 (citing 36 C.F.R. § 800.6(c)). Further, prior to the *Shubert* litigation, the Liberty Place Monument was deemed eligible for the inclusion on the National Register of Historic Places. (R. Doc. 138-3, at 45.)

the monument commemorates took place. There will be
an appropriate landscaping plan developed by the City.

(3)   To arrange an appropriate archeological review of
the present site of the monument if the April 21, 1981
letter from SHPO is not deemed adequate by the present
staff.

(4)   To perform appropriate archeological review
acceptable to the SHPO on the new site when it is
selected, and

(5)   To refurnish the monument to its original
appearance when originally erected.

*Id.* On October 23, 1989, the Louisiana SHPO responded to the City's
proposed agreement and accepted stipulations 1, 3, 4, and 5. *Id.*
at 42. However, the SHPO asked for clarification on the second
stipulation because the SHPO believed that the Battle of Liberty
Place took place between: (1) the Mississippi River, (2) the center
line of South and North Peters Streets, (3) the upriver side of
Poydras Street, and (4) the downriver side of Iberville Street.
*Id.* Thus, the SHPO requested assurance that the Liberty Place
Monument would be placed within those boundaries. *See id.* On
October 25, 1989, Mayor Barthelemey responded to the SHPO stating
that "[t]he clarification you have made regarding the second
stipulation is affirmed." *Id.* at 43. That same day, the SHPO
submitted a finding of "no adverse effect" on the Liberty Place
Monument and the MOA was confected. Once the City agreed to the
MOA's terms, it was bound to "carry out the undertaking in
accordance with the terms of the agreement." *Tyler v. Cisneros*,

136 F.3d 603, 608-09 (9th Cir. 1998) (citing *Waterford Citizens'
Ass'n v. Reilly*, 970 F.2d 1287, 1290 n.8 (4th Cir. 1992); 36 C.F.R.
§ 800.6(c) (explaining that once an agency enters an MOA, it "shall
carry out the undertaking in accordance with the terms of the
agreement" and failure to do so requires the agency to resubmit
the undertaking to the Advisory Council for comment).   In other
words, an "MOA is a contract and the City is bound by its terms."
*Tyler v. Cuomo*, 236 F.3d 1124, 1134 (9th Cir. 2000) (citing
*Citizens' Comm. for Envtl. Protection v. U.S. Coast Guard*, 456 F.
Supp. 101, 115 (D.N.J. 1978)).  Notably absent from the MOA,
however, is any requirement that the City maintain and display the
Liberty Place Monument in perpetuity.

Thus, the issue is whether the City's receipt of federal funds
to move the Liberty Place Monument in the early 1990s permanently
and indefinitely subjects the Liberty Place Monument to the NHPA.
The City argues that it does not and cites to *Waterford Citizen
Ass'n v. Reilly*, 970 F.2d 1287 (4th Cir. 1992) in support of this
position. (R. Doc. 138-1, at 10.) There, the Waterford Citizens'
Association[8] brought a declaratory action to compel the
Environmental Protection Agency ("EPA") to renew NHPA review
procedures before expanding an existing sewerage system at a
historic site. In 1978, a sewer collector system was constructed

---

[8] Waterford is a small Quaker village in Virginia that is listed on the National
Register of Historic Places. *Waterford Citizen Ass'n*, 970 F.2d at 1288.

in Waterford by the Loudoun County Sanitation Authority ("Sanitation Authority"). *Id.* The project was funded by the EPA and affected a site listed on the National Register; therefore, the Sanitation Authority and the EPA were required to comply with Section 106 of the NHPA. The EPA, Virginia's Historic Preservation Officer ("VHPO"), and the Advisory Council of Historic Preservation ("ACHP") executed an MOA whereby the EPA agreed to ensure that the Sanitation Authority submit any revision of the sewer system's final plan to the Virginia Historic Preservation Officer. *Id.*

In 1990, twelve years after the completion of the sewerage system, a developer was granted permission by the Sanitation Authority to connect new sewer lines into Waterford's sewer system. *Id.* The Sanitation Authority *requested no additional grant money from the EPA* for the expansion and did not consult with the VHPO prior to granting approval. The ACHP and the Virginia Historic Preservation Officer saw the new sewer connection as a revision of the sewer system's final plan. The ACHP and the VHPO argued that the EPA was required to comply with the original agreement by submitting proposed revisions to the sewer system for review and reopen the Section 106 process. *Id.* The EPA refused to submit the revisions for review or reopen the Section 106 process. In response, the Waterford Citizens' Association filed suit seeking

20

a declaratory judgment that Section 106 of the NHPA required the EPA to comply with the original agreement.

The Citizens' Association *argued that the MOA remained in effect even after the completion of the original project. Id.* at 1292. (emphasis added). They further argued that the new hookup to the sewer system was subject to the original MOA and Section 106 of the NHPA. *Id.* The Fourth Circuit disagreed. Specifically, while the court stated that the EPA was bound by the MOA for the period of the undertaking, *i.e.*, the completion of the original project, it held that the obligation assumed by the EPA by executing the MOA "lasted only through the life of the original project. . . . Although Section 106 authorizes an agreement and although a resultant agreement is binding on the parties to it during the 'undertaking,' *the agreement does not, in turn, perpetuate responsibility extending beyond the term of the undertaking—here the construction of the original sewer project." Id.* (emphasis added).

Thus, in this case, it follows that the City's obligations under Section 106 of the NHPA and the MOA executed by the City and the Louisiana SHPO for the original removal and re-erection of the Liberty Place Monument were extinguished upon the completion of that federal undertaking. *See id.* By April 8, 1993, the *Shubert* court determined that the agreement to re-erect the Liberty Place Monument was accomplished, and thus the federal undertaking

completed. *See* (R. Doc. 138-3, at 112-117.) Accordingly, any obligation pursuant to that federal undertaking ceased upon such completion. Therefore, the City's plan to remove the Liberty Place Monument, which is not funded, approved, or related to any federal funding or undertaking, does not require the initiation of Section 106 procedures or violate Section 106 the NHPA.

3.   **Plaintiffs' Remaining Claims as to the Liberty Place Monument**

Plaintiffs' remaining claims are alleged violations of the Fifth and Fourteenth Amendments to the United States Constitution and Article 12, Section 4 of the Louisiana Constitution. *See* (R. Doc. 1, at 30, 31, 41, 49.). Again, Plaintiffs have failed to brief these issues in response to the City's motion; however, the Court will address each in turn.

   a.   **Due Process**

The Due Process Clause of the Fourteenth Amendment declares that no State shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. There are two types of due process protections: substantive and procedural. *Jones v. Bd. of Supervisors of the Univ. of La. Sys.*, No. 14-2304, 2015 WL 3409477, at *4 (E.D. La. May 27, 2015). In order for a person to have a procedural due process claim that damages or other relief can remedy, that person must have been denied life, liberty, or property protected by the Fourteenth Amendment. *Wilson v. Birnberg*, 667 F.3d 591, 597 (5th Cir. 2012)

(citing *Meza v. Livingston*, 607 F.3d 392, 299 (5th Cir. 2010)).
The Supreme Court has adopted a two-step analysis to examine
whether an individual's procedural due process rights have been
violated. The first question "asks whether there exists a liberty
or property interest which has been interfered with by the State;
the second examines whether the procedures attendant upon that
deprivation were constitutionally sufficient." *Meza*, 607 F.3d 392,
299 (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460
(1989)).

Substantive due process bars arbitrary, wrongful government
action regardless of the fairness of the procedures used to
implement them. *Lewis v. Univ. of Tex.*, 665 F.3d 625, 630-31 (5th
Cir. 2011); *March Outdoor Advert., Inc. v. Reg'l Transit Auth.*,
489 F.3d 669, 673 n.3 (5th Cir. 2007) (quoting *Zinermon v. Burch*,
494 U.S. 113, 125 (1990)). In order to establish a substantive due
process violation, a plaintiff must first show the existence of a
constitutionally protected right to which the Fourteenth
Amendment's due process protection applies. *Simi Inv. Co., Inc. v.
Harris Cnty, Tex.*, 236 F.3d 240, 249-50 (5th Cir. 2000). "If there
is no denial of life, liberty, or property, then the government is
not required to provide due process." *Monumental Task Comm., Inc.
v. Foxx*, 157 F. Supp. 3d 573, 594 (E.D. La. 2016). The Supreme
Court has explained that property interests, for the purposes of
the Due Process Clause, are created and defined by existing rules

or understandings that stem from an independent source such as state law. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). The Court further stated that a protected property interest requires more than a person's abstract need, desire, or unilateral expectation of it; one must instead have a legitimate claim of entitlement to the property interest. *Id.*

Plaintiffs' complaint alleges that they have a recognizable interest in the aesthetic and cultural well-being of the City of New Orleans and in the preservation of the Liberty Place Monument. (R. Doc. 1, at 8.) This abstract need or desire to preserve the well-being of New Orleans and the Liberty Place Monument is not a constitutionally protected right. Because Plaintiffs have failed to provide any evidence of a constitutionally protected right in the Liberty Place Monument, Plaintiffs' due process claims as to the Liberty Place Monument are dismissed.

**b. Equal Protection**

The Equal Protection Clause commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The clause 'is essentially a direction that all persons similarly situated should be treated alike.'" *Qutb v. Strauss*, 11 F.3d 488, 492 (5th Cir. 1993) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). The Equal Protection Clause is implicated "[o]nly if the

challenged government action classifies or distinguishes between two or more relevant groups." *Id.*

Plaintiffs have failed to present any evidence that removal of the Liberty Place Monument "classifies or distinguishes between two or more relevant groups." Therefore, Plaintiffs' equal protection claims as to the Liberty Place Monument are dismissed.

### c.   Article XII, Section 4 of the Louisiana Constitution

Finally, Plaintiffs argue that the City's "effort to remove the . . . Liberty Monument is a violation of the rights guaranteed by Article 12, § 4 of the Louisiana Constitution." (R. Doc. 1, at 41.) As this Court explained in its Order and Reasons denying Plaintiffs' motion for preliminary injunction:

> Article XII, section 4 of the Louisiana Constitution of 1974 recognizes the "right of the people to preserve, foster, and promote their respective historic linguistic and cultural origins." La. Const. art. XII, § 4. The driving force behind the provision was preservation of the French language and culture. Lee Hargrave, "Statutory" and Hortatory" Provisions of the Louisiana Constitution of 1974, 43 La. L. Rev. 647, 682 (1983). The law was supported primarily by French-speaking delegates who were concerned with the protection of the Acadian French culture. *Id.* No court has ever invalidated a law using this provision.
>
> Professor Lee Hargrave suggested that the development and intent of article XII, section 4 support a narrow construction of the law. For example, the principal drafter's stated intent was "to encourage bilingualism rather than make a drastic innovation." *Id.* at 684. Moreover, an early proposal of the section expressly included certain rights: "This includes the right of the people of a political subdivision to use the language or languages of their choice in their local schools and other public institutions. Private schools are free to

25

teach in any language." *Id.* at 682-83. However, these two sentences were deleted in committee. Therefore, although article XII, section 4 recognizes the right of the people to preserve and advance their language, "the development of the proposal indicates there would hardly be a right to have the public schools teach that language." *Id.* at 684.

Considering the legislative history, Hargrave argued that "[a]t best, this provision might been seen as a particularization of those principles protecting the rights of association that have been grafted onto the first amendment, encompassing a right to unite and associate for promotion of certain values and causes." *Id.* However, "as with its first amendment cousin, it is unlikely that the section would be invoked to protect all cultural origins." *Id.* For example, it would not permit a citizen who immigrated to Louisiana "to foster his origins by committing ritualistic robbery and murder." *Id.* Thus, the rights covered by article XII, section 4 are "vague ones that can be balanced against other interests." *Id.*

According to Plaintiffs, the purpose of the Liberty Place Monument is to "recognize[] conflicts that emerged in New Orleans and elsewhere during the post-Civil War period." (R. Doc. 1, at 41.) Nevertheless, Plaintiffs have not presented any evidence that removal of the Liberty Place Monument will infringe upon their right to preserve, foster, and promote their historic, linguistic, and cultural origins. Further, monuments displayed on public property typically represent government speech, *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470 (2009), and the City has the right to "speak for itself." *Id.* at 467. Plaintiffs may not compel the City to promote their culture. *cf. Hargrave*, *supra*, at 684 (explaining that Article XII, Section 4 does not establish a

26

right to promote a particular cultural origin). Accordingly, Plaintiffs' claims under Article XII, Section 4 of the Louisiana Constitution are dismissed.

**4.  Summary**

In conclusion, and to ensure clarity, the Court holds as follows: (1) The *Shubert* Consent Order does not prevent the City from removing the Liberty Place Monument; thus, its removal does not violate the *Shubert* Consent Order; (2) Removal of the Liberty Place Monument does not violate the National Historic Preservation Act, and the City is not required to initiate a Section 106 review prior to removing the Liberty Place Monument; (3) Plaintiffs have failed to demonstrate a constitutionally or legally protected right or interest in the Liberty Place Monument, and thus removal of the monument does not violate Plaintiffs' rights under the United States or Louisiana Constitutions. Consequently, for the reasons explained above, the City's *Motion for Summary Judgment* is granted, and Plaintiffs' claims as to the Liberty Place Monument are dismissed with prejudice.

**CONCLUSION**

Accordingly,

   **IT IS HEREBY ORDERED** that the City's *Motion for Summary Judgment* **(R. Doc. 138)** is **GRANTED** and that Plaintiffs' claims as to the Liberty Place Monument are **DISMISSED WITH PREJUDICE**.

   **IT IS FURTHER ORDERED** that the City's *Motion to Dismiss* **(R. Doc. 120)** is **DISMISSED AS MOOT**.

   New Orleans, Louisiana this 8th day of March, 2017.


_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE